(Slip Opinion) OCTOBER TERM, 2013 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## LOZANO *v.* MONTOYA ALVAREZ

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR
THE SECOND CIRCUIT

No. 12–820.  Argued December 11, 2013—Decided March 5, 2014

When one parent abducts a child and flees to another country, the other parent may file a petition in that country for the return of the child pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (Hague Convention or Convention).  If the parent files a petition within one year of the child's removal, a court "shall order the return of the child forthwith."  But when the petition is filed after the 1-year period expires, the court "shall . . . order the return of the child, unless it is demonstrated that the child is now settled in its new environment."

Respondent Montoya Alvarez and petitioner Lozano resided with their daughter in London until November 2008, when Montoya Alvarez left with the child for a women's shelter.  In July 2009, Montoya Alvarez and the child left the United Kingdom and ultimately settled in New York.  Lozano did not locate Montoya Alvarez and the child until November 2010, more than 16 months after Montoya Alvarez and the child had left the United Kingdom.  At that point, Lozano filed a Petition for Return of Child pursuant to the Hague Convention in the Southern District of New York.  Finding that the petition was filed more than one year after removal, the court denied the petition on the basis that the child was now settled in New York.  It also held that the 1-year period could not be extended by equitable tolling.  The Second Circuit affirmed.

*Held*: Article 12's 1-year period is not subject to equitable tolling. Pp. 7–16.

 (a) The doctrine of equitable tolling, as applied to federal statutes of limitations, extends an otherwise discrete limitations period set by Congress.  Thus, whether tolling is available is fundamentally a question of statutory intent.  Because Congress "legislate[s] against a

background of common-law adjudicatory principles," *Astoria Fed. Sav. & Loan Assn.* v. *Solimino*, 501 U. S. 104, 108, including equitable tolling, see *Holmberg* v. *Armbrecht*, 327 U. S. 392, 397, equitable tolling is presumed to apply if the period in question is a statute of limitations and if tolling is consistent with the statute, *Young* v. *United States*, 535 U. S. 43, 49–50. Pp. 7–8.

(b) In assessing whether equitable tolling applies to treaties, which are " 'compact[s] between independent nations,' " *Medellín* v. *Texas*, 552 U. S. 491, 505, this Court's "duty [i]s to ascertain the intent of the parties" by looking to the document's text and context, *United States* v. *Choctaw Nation*, 179 U. S. 494, 535. The parties to the Hague Convention did not intend equitable tolling to apply to Article 12's 1-year period. Pp. 8–16.

(1) There is no general presumption that equitable tolling applies to treaties. Though part of the established backdrop of American law, equitable tolling has no proper role in the interpretation of treaties unless that principle is shared by the parties to the "agreement among sovereign powers," *Zicherman* v. *Korean Air Lines Co.*, 516 U. S. 217, 226. Lozano has identified no such shared principle among the Convention signatories, and the courts of several signatories have explicitly rejected equitable tolling of the Convention. Thus, the American presumption does not apply to this multilateral treaty. The International Child Abduction Remedies Act, 42 U. S. C. §§11601–11610, which Congress enacted to implement the Convention, neither addresses the availability of equitable tolling nor purports to alter the Convention, and therefore does not affect this conclusion. Pp. 9–11.

(2) Even if the Convention were subject to a presumption that statutes of limitations may be tolled, Article 12's 1-year period is not a statute of limitations. Statutes of limitations embody a "policy of repose, designed to protect defendants," *Burnett* v. *New York Central R. Co.*, 380 U. S. 424, 428, and foster the "elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities," *Rotella* v. *Wood*, 528 U. S. 549, 555. Here, the remedy the Convention affords the left-behind parent— return of the child—continues to be available after one year, thus preserving the possibility of relief for that parent and preventing repose for the abducting parent. The period's expiration also does not establish certainty about the parties' respective rights. Instead, it opens the door to consideration of a third party's interests, *i.e.,* the child's interest in settlement. Because that is not the sort of interest addressed by a statute of limitations, the 1-year period should not be treated as a statute of limitations. *Young, supra,* at 47, distinguished. Pp. 11–13.

Syllabus

(3) Without a presumption of equitable tolling, the Convention does not support extending the 1-year period during concealment. Article 12 explicitly provides for the period to commence on "the date of the wrongful removal or retention" and makes no provision for an extension. Because the drafters did not choose to delay the period's commencement until discovery of the child's location—the obvious alternative to the date of wrongful removal—the natural implication is that they did not intend to commence the period on that later date. Lozano contends that equitable tolling is nonetheless consistent with the Convention's goal of deterring child abductions, but the Convention does not pursue that goal at any cost, having recognized that the return remedy may be overcome by, *e.g.,* the child's interest in settlement. And the abducting parent does not necessarily profit by running out the clock, since both American courts and other Convention signatories have considered concealment as a factor in determining whether a child is settled. Equitable tolling is therefore neither required by the Convention nor the only available means to advance its objectives. Pp. 13–15.

(4) Lozano contends that there is room for United States courts to apply equitable tolling because the Convention recognizes that other sources of law may permit signatory states to return abducted children even when return is not available or required by the Convention. But this contention mistakes the nature of equitable tolling, which may be applied to the Hague Convention only if the treaty drafters so intended. For the foregoing reason, they did not. Pp. 15–16.

697 F. 3d 41, affirmed.

THOMAS, J., delivered the opinion for a unanimous Court. ALITO, J., filed a concurring opinion, in which BREYER and SOTOMAYOR, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 12–820

## MANUEL JOSE LOZANO, PETITIONER *v.* DIANA LUCIA MONTOYA ALVAREZ

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[March 5, 2014]

JUSTICE THOMAS delivered the opinion of the Court.

When a parent abducts a child and flees to another country, the Hague Convention on the Civil Aspects of International Child Abduction generally requires that country to return the child immediately if the other parent requests return within one year. The question in this case is whether that 1-year period is subject to equitable tolling when the abducting parent conceals the child's location from the other parent. We hold that equitable tolling is not available.

I

To address "the problem of international child abductions during domestic disputes," *Abbott* v. *Abbott*, 560 U. S. 1, 8 (2010), in 1980 the Hague Conference on Private International Law adopted the Convention on the Civil Aspects of International Child Abduction (Hague Convention or Convention), T. I. A. S. No. 11670, S. Treaty Doc. No. 99–11 (Treaty Doc.). The Convention states two primary objectives: "to secure the prompt return of children wrongfully removed to or retained in any Contracting State," and "to ensure that rights of custody and of access

under the law of one Contracting State are effectively respected in the other Contracting States." Art. 1, *id.,* at 7.

To those ends, the Convention's "central operating feature" is the return of the child. *Abbott*, 560 U. S., at 9. That remedy, in effect, lays venue for the ultimate custody determination in the child's country of habitual residence rather than the country to which the child is abducted. See *id.,* at 20 ("The Convention is based on the principle that the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence").

The return remedy is not absolute. Article 13 excuses return where, for example, the left-behind parent was not "actually exercising" custody rights when the abducting parent removed the child, or where there is a "grave risk" that return would "place the child in an intolerable situation." Hague Convention, Arts. 13(a)–(b), Treaty Doc., at 10. A state may also refuse to return the child if doing so would contravene "fundamental principles . . . relating to the protection of human rights and fundamental freedoms." Art. 20, *id.*, at 11.

This case concerns another exception to the return remedy. Article 12 of the Convention states the general rule that when a court receives a petition for return within one year after the child's wrongful removal, the court "shall order the return of the child forthwith." *Id.,* at 9. Article 12 further provides that the court,

> "where the proceedings have been commenced after the expiration of the period of one year [from the date of the wrongful removal], shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment." *Ibid.*

Thus, at least in some cases, failure to file a petition for return within one year renders the return remedy

unavailable.

The United States ratified the Hague Convention in 1988, and Congress implemented the Convention that same year through the International Child Abduction Remedies Act (ICARA). 102 Stat. 437, 42 U. S. C. §§11601–11610. That statute instructs courts to "decide the case in accordance with the Convention." §11603(d). Echoing the Convention, ICARA further provides that "[c]hildren who are wrongfully removed . . . are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies." §11601(a)(4). Finally, ICARA requires the abducting parent to establish by a preponderance of the evidence that Article 12's exception to return applies. §11603(e)(2)(B).

## II

Diana Lucia Montoya Alvarez and Manuel Jose Lozano are the parents of the girl at the center of this dispute.[1] Montoya Alvarez and Lozano met and began dating in London in early 2004. Montoya Alvarez gave birth to a daughter in October 2005.

Montoya Alvarez and Lozano describe their relationship in starkly different terms. Lozano stated that they were "'very happy together,'" albeit with "normal couple problems." *In re Lozano*, 809 F. Supp. 2d 197, 204 (SDNY 2011). Montoya Alvarez described a pattern of physical and emotional abuse that included multiple incidents of rape and battery. The District Court found insufficient evidence to make specific findings about domestic violence but determined that Lozano's claim that he never mistreated Montoya Alvarez was "not credible." *Id.,* at 206.

The parties also differ as to the child's well-being during the first three years of her life. Lozano stated that he and

––––––––––

[1] Except where otherwise noted, the facts are taken from the District Court's findings. Like the courts below, we refer to Montoya Alvarez and Lozano's daughter as "the child" to protect her identity.

the child had a very good relationship, and that the child
was generally happy. Montoya Alvarez believed other-
wise. In October 2008, Montoya Alvarez reported to the
child's doctor that she refused to speak at the nursery she
attended, cried often, and wet the bed. Montoya Alvarez
also stated that the child refused to speak when Lozano
was present. The child's nursery manager wrote that the
girl was "'very withdrawn,'" and noted that the home
"'environment obviously had a negative effect'" on her.
*Id.,* at 207. The District Court found insufficient evidence
that Lozano had physically abused the child, but did con-
clude that the child had seen and heard her parents argu-
ing at home.

In November 2008, when the child was just over three
years old, Montoya Alvarez went to New York to visit her
sister Maria. During that time, the child remained in
London with Lozano and his visiting mother. When Mon-
toya Alvarez returned on November 18, she became acutely
concerned about the child's fearful behavior around Lo-
zano. The next day, Montoya Alvarez left with the child
and never returned.

Montoya Alvarez and the child lived at a women's shel-
ter for the next seven months. After Montoya Alvarez was
unable to find suitable long-term accommodations in the
United Kingdom, she and the child left for France on July
3, 2009, and then for the United States, arriving five days
later. Since their arrival, Montoya Alvarez and the child
have lived with Montoya Alvarez' sister Maria and her
family in New York.

When they arrived in New York, Montoya Alvarez and
the child began seeing a therapist at a family medical
clinic. The therapist testified that, at first, the child was
withdrawn and would wet herself. The therapist diag-
nosed her with posttraumatic stress disorder. Within six
months, however, the therapist described her as "'a com-
pletely different child,'" who had stopped wetting herself,

was excited to play with friends, and was able to speak freely about her emotions. *Id.,* at 212. When Montoya Alvarez and the child returned to the therapist after Lozano filed a petition for the child's return, the therapist noted that the child was doing well but did not wish to see her father.

In the meantime, Lozano attempted to find Montoya Alvarez and the child. Shortly after Montoya Alvarez left in November 2008, he called her sister Gloria in London, but eventually received legal advice not to speak with Montoya Alvarez' family. A mediation service also sent several letters to Montoya Alvarez on Lozano's behalf without receiving a response. In July 2009, Lozano filed an application for a court order in the United Kingdom "'to ensure that he obtains regular contact with his [child] and plays an active role in [her] life.'" *Id.,* at 210. He also sought court orders to compel Montoya Alvarez' sisters and legal counsel, the child's doctor and nursery, and various government offices in London to disclose the child's whereabouts.

On March 15, 2010, after determining that the child was not in the United Kingdom (and suspecting that the child was in New York), Lozano filed a form with the Hague Convention Central Authority for England and Wales seeking to have the child returned.[2] The United States Central Authority—the Office of Children's Issues in the Department of State, see 22 CFR §94.2 (2013)—received the application on March 23, 2010. After the Office of Children's Issues confirmed that Montoya Alvarez had entered the United States, Lozano located Montoya Alvarez' address in New York. On November 10, 2010, more than 16 months after Montoya Alvarez and the child left

_____

[2] Article 6 of the Hague Convention requires each Contracting State to "designate a Central Authority to discharge the duties which are imposed by the Convention upon such authorities." Treaty Doc., at 8.

the United Kingdom, Lozano filed a Petition for Return of Child pursuant to the Hague Convention and ICARA, 42 U. S. C. §11603, in the United States District Court for the Southern District of New York.

After a 2-day evidentiary hearing, the District Court denied Lozano's petition. 809 F. Supp. 2d 197. The District Court concluded that Lozano had stated a prima facie case of wrongful removal under the Hague Convention. *Id.,* at 219–220. Prior to her removal, the child was a habitual resident of the United Kingdom, see Hague Convention, Art. 4, and Lozano had custody rights that he was actually exercising at the time of removal, see Arts. 3(a)–(b).

Because the petition was filed more than one year after the child's wrongful removal, however, the District Court denied the petition on the basis that the child was now settled in New York. *Id.*, at 230, 234. "Viewing the totality of the circumstances," the court found sufficient indicia of "stability in her family, educational, social, and most importantly, home life," *id.,* at 233, to conclude that the child was settled in her current environment and that repatriation would be "extremely disruptive," *id.,* at 234. Lozano argued that the child should be returned forthwith because the 1-year period in Article 12 should be equitably tolled during the period that Montoya Alvarez concealed the child. The court rejected that argument, holding that the 1-year period could not be extended by equitable tolling.[3] *Id.,* at 228–229.

_____

[3] The District Court held in the alternative that even if equitable tolling could apply, it would not be warranted in this case because Lozano had contact information for Montoya Alvarez' sister Maria in New York. Lozano's solicitors did not attempt to contact Maria to determine if Montoya Alvarez and the child were there. 809 F. Supp. 2d, at 229–230.

Consistent with Second Circuit precedent, see *Blondin* v. *Dubois*, 238 F. 3d 153, 164 (2001), the District Court also considered "whether to

On appeal, the Second Circuit affirmed. 697 F. 3d 41 (2012). The Court of Appeals agreed that the 1-year period in Article 12 is not subject to equitable tolling. According to the court, unlike a statute of limitations that would prohibit the filing of a return petition after one year, the 1-year period in Article 12 merely permits courts, after that period has run, to consider the interests of the child in settlement. *Id.,* at 52. The Second Circuit concluded that allowing equitable tolling to delay consideration of the child's interests would undermine the purpose of the Hague Convention. *Id.,* at 54.

We granted certiorari to decide whether Article 12's 1-year period is subject to equitable tolling. 570 U. S. \_\_\_ (2013). Compare 697 F. 3d*,* at 50–55 (equitable tolling not available); and *Yaman* v. *Yaman*, 730 F. 3d 1, 12–16 (CA1 2013) (same), with *Duarte* v. *Bardales*, 526 F. 3d 563, 568–570 (CA9 2008) (equitable tolling available); and *Furnes* v. *Reeves*, 362 F. 3d 702, 723–724 (CA11 2004) (same). We hold that equitable tolling is not available, and therefore affirm.

## III

Although this case concerns the application of equitable tolling to a treaty, we begin with a more familiar context: equitable tolling of federal statutes of limitations. As a general matter, equitable tolling pauses the running of, or "tolls," a statute of limitations when a litigant has pursued his rights diligently but some extraordinary circumstance prevents him from bringing a timely action. See, *e.g., Pace* v. *DiGuglielmo*, 544 U. S. 408, 418 (2005). Because the doctrine effectively extends an otherwise discrete limita-

----

exercise its discretion and repatriate the child even though she is now settled in New York." 809 F. Supp. 2d, at 234. The court declined to exercise that discretion because the "strong evidence that the child is quite settled in New York" outweighed Lozano's "fairly diligent" search efforts and Montoya Alvarez' conduct. *Ibid.*

tions period set by Congress, whether equitable tolling is available is fundamentally a question of statutory intent. See, *e.g., Irwin* v. *Department of Veterans Affairs*, 498 U. S. 89, 95 (1990); *Bowen* v. *City of New York*, 476 U. S. 467, 479–480 (1986); *Honda* v. *Clark*, 386 U. S. 484, 501 (1967).

As applied to federal statutes of limitations, the inquiry begins with the understanding that Congress "legislate[s] against a background of common-law adjudicatory principles." *Astoria Fed. Sav. & Loan Assn.* v. *Solimino*, 501 U. S. 104, 108 (1991). Equitable tolling, a long-established feature of American jurisprudence derived from "the old chancery rule," *Holmberg* v. *Armbrecht*, 327 U. S. 392, 397 (1946), is just such a principle. See *Young* v. *United States*, 535 U. S. 43, 49–50 (2002) ("Congress must be presumed to draft limitations periods in light of this background principle"); *Bailey* v. *Glover*, 21 Wall. 342, 349–350 (1875). We therefore presume that equitable tolling applies if the period in question is a statute of limitations and if tolling is consistent with the statute. *Young, supra*, at 49–50 ("It is hornbook law that limitations periods are 'customarily subject to "equitable tolling,"' unless tolling would be 'inconsistent with the text of the relevant statute'" (citation omitted)).

IV

The Hague Convention, of course, is a treaty, not a federal statute. For treaties, which are primarily "'compact[s] between independent nations,'" *Medellín* v. *Texas*, 552 U. S. 491, 505 (2008), our "duty [i]s to ascertain the intent of the parties" by looking to the document's text and context, *United States* v. *Choctaw Nation*, 179 U. S. 494, 535 (1900); see also *BG Group plc* v. *Republic of Argentina*, *post*, at 10.

We conclude that the parties to the Hague Convention did not intend equitable tolling to apply to the 1-year

period in Article 12. Unlike federal statutes of limitations, the Convention was not adopted against a shared background of equitable tolling. Even if the Convention were subject to a presumption that statutes of limitations may be tolled, the 1-year period in Article 12 is not a statute of limitations. And absent a presumption in favor of equitable tolling, nothing in the Convention warrants tolling the 1-year period.

## A

First, there is no general presumption that equitable tolling applies to treaties. Congress is presumed to incorporate equitable tolling into federal statutes of limitations because equitable tolling is part of the established backdrop of American law. *Rotella* v. *Wood*, 528 U. S. 549, 560 (2000) ("[F]ederal statutes of limitations are generally subject to equitable principles of tolling"). It does not follow, however, that we can export such background principles of United States law to contexts outside their jurisprudential home.

It is particularly inappropriate to deploy this background principle of American law automatically when interpreting a treaty. "A treaty is in its nature a contract between . . . nations, not a legislative act." *Foster* v. *Neilson*, 2 Pet. 253, 314 (1829) (Marshall, C. J., for the Court); see also 2 Debates on the Federal Constitution 506 (J. Elliot 2d ed. 1863) (James Wilson) ("[I]n their nature treaties originate differently from laws. They are made by equal parties, and each side has half of the bargain to make . . . "). That distinction has been reflected in the way we interpret treaties. It is our "responsibility to read the treaty in a manner 'consistent with the *shared* expectations of the contracting parties.'" *Olympic Airways* v. *Husain*, 540 U. S. 644, 650 (2004) (quoting *Air France* v. *Saks*, 470 U. S. 392, 399 (1985); emphasis added). Even if a background principle is relevant to the interpretation of

federal statutes, it has no proper role in the interpretation of treaties unless that principle is shared by the parties to "an agreement among sovereign powers," *Zicherman* v. *Korean Air Lines Co.*, 516 U. S. 217, 226 (1996).

Lozano has not identified a background principle of equitable tolling that is shared by the signatories to the Hague Convention. To the contrary, Lozano concedes that in the context of the Convention, "foreign courts have failed to adopt equitable tolling . . . because they lac[k] the presumption that we [have]." Tr. of Oral Arg. 19–20. While no signatory state's court of last resort has resolved the question, intermediate courts of appeals in several states have rejected equitable tolling. See *Cannon* v. *Cannon*, [2004] EWCA (Civ) 1330, [2005] 1 W. L. R. 32, ¶51 (Eng.), (rejecting the "tolling rule" as "too crude an approach" for the Convention); *Kubera* v. *Kubera*, 3 B. C. L. R. (5th) 121, ¶64, 317 D. L. R. (4th) 307, ¶64 (2010) (Can.) (equitable tolling "has not been adopted in other jurisdictions, including Canada"); see also *HJ* v. *Secretary for Justice*, [2006] NZFLR 1005, ¶53 (CA), appeal dism'd on other grounds, [2007] 2 NZLR 289; *A. C.* v. *P. C.*, [2005] HKEC 839, 2005 WL 836263, ¶55, (Hong Kong Ct. 1st Instance).[4] The American presumption that federal statutes of limitations can be equitably tolled therefore does not apply to this multilateral treaty. Cf. *Eastern Airlines, Inc.* v. *Floyd*, 499 U. S. 530, 544–545, and n. 10 (1991) (declining to adopt liability for psychic injury under the Warsaw Convention because "the unavailability of compensation for purely psychic injury in many common and civil law countries at the time of the Warsaw Conference persuades us that the signatories had no specific intent

––––––––

[4] Lozano contends that a single-judge decision by an English family court adopted equitable tolling without referring to it by name. See *In re H*, [2000] 2 F. L. R. 51, [2000] 3 F. C. R. 404 (Eng.). It is unclear whether the logic of that decision survived the decision of the Court of Appeals for England and Wales in *Cannon*.

to include such a remedy in the Convention" (footnote omitted)).

It does not matter to this conclusion that Congress enacted a statute to implement the Hague Convention. See ICARA, 42 U. S. C. §§11601–11610. ICARA does not address the availability of equitable tolling. Nor does it purport to alter the Convention. See §11601(b)(2) ("The provisions of [ICARA] are in addition to and not in lieu of the provisions of the Convention"). In fact, Congress explicitly recognized "the need for uniform international interpretation of the Convention." §11601(b)(3)(B). Congress' mere enactment of implementing legislation did not somehow import background principles of American law into the treaty interpretation process, thereby altering our understanding of the treaty itself.

## B

Even if the presumption in favor of equitable tolling had force outside of domestic law, we have only applied that presumption to statutes of limitations. See *Hallstrom* v. *Tillamook County*, 493 U. S. 20, 27 (1989) (no equitable tolling of a 60-day presuit notice requirement that does not operate as a statute of limitations). The 1-year period in Article 12 is not a statute of limitations.

As a general matter, "[s]tatutes of limitations establish the period of time within which a claimant must bring an action." *Heimeshoff* v. *Hartford Life & Accident Ins. Co.*, 571 U. S. ___, ___ (2013) (slip op., at 4). They characteristically embody a "policy of repose, designed to protect defendants." *Burnett* v. *New York Central R. Co.*, 380 U. S. 424, 428 (1965). And they foster the "elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities." *Rotella, supra,* at 555.

In *Young*, 535 U. S. 43, we evaluated whether those characteristics of statutes of limitations were present in

the "three-year lookback period" for tax liabilities in bank-
ruptcy proceedings.    The Bankruptcy Code favors tax
claims less than three years old in two respects: Such
claims cannot be discharged, and they have priority over
certain others in bankruptcy proceedings.    See 11 U. S. C.
§§507(a)(8)(A)(i), 523(a)(1)(A).    If the Internal Revenue
Service "sleeps on its rights" by failing to prosecute those
claims within three years, however, then those mecha-
nisms for enforcing claims against bankrupt taxpayers are
eliminated.    *Young*, 535 U. S., at 47.    We concluded that
the lookback period "serves the same 'basic policies [fur-
thered by] all limitations provisions,'" *ibid.* (quoting *Ro-
tella*, 528 U. S., at 555), *i.e.*, certainty and repose.    We
accordingly    held    that    it    was    a    limitations    period
presumptively   subject   to   equitable   tolling.     535   U. S.,
at 47.

Unlike the 3-year lookback period in *Young*, expiration
of the 1-year period in Article 12 does not eliminate the
remedy the Convention affords the left-behind parent—
namely, the return of the child.    Before one year has
elapsed, Article 12 provides that the court "shall order the
return of the child forthwith."    Treaty Doc., at 9.    But even
after that period has expired, the court "shall also order
the return of the child, unless it is demonstrated that the
child is now settled."    *Ibid.*    The continued availability of
the return remedy after one year preserves the possibility
of relief for the left-behind parent and prevents repose
for the abducting parent.[5]    Rather than establishing any

─────────────

[5] In the State Department's view, the Hague Convention confers equi-
table discretion on courts to order the return of a child even if the court
determines that the child is "settled" within the meaning of Article 12.
See Brief for United States as *Amicus Curiae* 19–25.    If accurate, that
interpretation would reinforce that Article 12 is not meant to provide
repose to the abducting parent, and it would underscore that the 1-year
period is not a statute of limitations.    But we do not decide whether,
and under what circumstances, a court may exercise discretion to order

certainty about the respective rights of the parties, the expiration of the 1-year period opens the door to consideration of a third party's interests, *i.e.,* the child's interest in settlement. Because that is not the sort of interest addressed by a statute of limitations, we decline to treat the 1-year period as a statute of limitations.[6]

C

Without a presumption of equitable tolling, the Convention does not support extending the 1-year period during concealment. Article 12 explicitly provides that the 1-year period commences on "the date of the wrongful removal or retention," and makes no provision for an extension of that period. *Id.,* at 9. Further, the practical effect of the tolling that Lozano requests would be to delay the commencement of the 1-year period until the left-behind parent discovers the child's location. Commencing the 1-year period upon discovery is the obvious alternative to the commencement date the drafters actually adopted because the subject of the Hague Convention, child abduction, is naturally associated with the sort of concealment that might justify equitable tolling under other circumstances. See 697 F. 3d, at 51, n. 8 ("It would have been a simple

———————

return notwithstanding the child's subsequent settlement. In the Court of Appeals, Lozano failed to challenge the District Court's decision not to exercise its discretion to order the return of the settled child, see n. 3, *supra,* and that issue is beyond the scope of the question presented before this Court.

[6] Lozano argues that the United States delegation referred to the 1-year period as a "statute of limitations" at various points during and after the drafting process. Brief for Petitioner 27–28. Because the determination whether the 1-year period is a statute of limitations depends on its functional characteristics, it is not significant that the delegation used that label. In any event, we doubt that the remarks of a single delegation are sufficient under these circumstances to establish the "'shared expectations of the contracting parties.'" *Olympic Airways* v. *Husain,* 540 U. S. 644, 651 (2004) (quoting *Air France* v. *Saks,* 470 U. S. 392, 399 (1985)).

matter, if the state parties to the Convention wished to take account of the possibility that an abducting parent might make it difficult for the petitioning parent to discover the child's whereabouts, to run the period 'from the date that the petitioning parent learned [or, could reasonably have learned] of the child's whereabouts'" (alterations in original)).  Given that the drafters did not adopt that alternative, the natural implication is that they did not intend the 1-year period to commence on that later date.  Cf. *Sebelius* v. *Auburn Regional Medical Center*, 568 U. S. ___, ___ (2013) (slip op., at 10–11).  We cannot revisit that choice.

Lozano contends that equitable tolling is nevertheless consistent with the purpose of the Hague Convention because it is necessary to deter child abductions.  In his view, "absent equitable tolling, concealment 'probably will' result in non-return," which will in turn encourage abduction.  Reply Brief 14–15; see also *Duarte*, 526 F. 3d, at 570.

We agree, of course, that the Convention reflects a design to discourage child abduction.  But the Convention does not pursue that goal at any cost.  The child's interest in choosing to remain, Art. 13, or in avoiding physical or psychological harm, Art. 13(b), may overcome the return remedy.  The same is true of the child's interest in settlement.  See *supra,* at 2; see also *In re M*, [2008] 1 A. C. 1288, 1310 (Eng. 2007) (opinion of Baroness Hale of Richmond) ("These children should not be made to suffer for the sake of general deterrence of the evil of child abduction world wide").  We are unwilling to apply equitable tolling principles that would, in practice, rewrite the treaty.  See *Chan* v. *Korean Air Lines, Ltd.*, 490 U. S. 122, 134–135 (1989) ("'[T]o alter, amend, or add to any treaty by inserting any clause, whether small or great, important or trivial, would be . . . to make, and not to construe a treaty'" (quoting *The Amiable Isabella*, 6 Wheat. 1, 71 (1821) (Story, J., for the Court))).

Nor is it true that an abducting parent who conceals a child's whereabouts will necessarily profit by running out the clock on the 1-year period. American courts have found as a factual matter that steps taken to promote concealment can also prevent the stable attachments that make a child "settled." See, *e.g., Mendez Lynch* v. *Mendez Lynch*, 220 F. Supp. 2d 1347, 1363–1364 (MD Fla. 2002) (children not settled when they "lived in seven different locations" in 18 months); *Wigley* v. *Hares*, 82 So. 3d 932, 942 (Fla. App. 2011) ("The mother purposely kept him out of all community activities, sports, and even church to avoid detection by the father"); *In re Coffield*, 96 Ohio App. 3d 52, 58, 644 N. E. 2d 662, 666 (1994) (child not settled when the abducting parent "was attempting to hide [child's] identity" by withholding child from school and other organized activities). Other signatories to the Hague Convention have likewise recognized that concealment may be taken into account in the factual determination whether the child is settled. See, *e.g., Cannon*, [2005] 1 W. L. R., ¶¶52–61. See also *Kubera*, 3 B. C. L. R. (5th), ¶47, 317 D. L. R. (4th), ¶47; *A. C.* v. *P. C.*, [2005] HKEC 839, ¶39, 2005 WL 836263, ¶39. Equitable tolling is therefore neither required by the Convention nor the only available means to advance its objectives.

D

Finally, Lozano contends that the Hague Convention leaves room for United States courts to apply their own "common law doctrine of equitable tolling" to the 1-year period in Article 12 without regard to whether the drafters of the Convention intended equitable tolling to apply. Brief for Petitioner 25. Specifically, Lozano contends that the Convention recognizes additional sources of law that permit signatory states to return abducted children even when return is not available or required pursuant to the Convention. Article 34 of the Convention provides that

"for the purpos[e] of obtaining the return of a child," the Convention "shall not restrict the application of an international instrument in force between the State of origin and the State addressed" or the application of "other law of the State addressed." Treaty Doc., at 13; see also Art. 18, *id.,* at 11 ("The provisions of this Chapter do not limit the power of a judicial or administrative authority to order the return of the child at any time"). In Lozano's view, equitable tolling principles constitute "other law" that should apply here.

That contention mistakes the nature of equitable tolling as this Court has applied it. We do not apply equitable tolling as a matter of some independent authority to reconsider the fairness of legislative judgments balancing the needs for relief and repose. See *supra,* at 7–8. To the contrary, we may apply equitable tolling to the Hague Convention only if we determine that the treaty drafters so intended. See *Choctaw Nation*, 179 U. S., at 535. For the foregoing reasons, we conclude that they did not.

## V

The Court of Appeals correctly concluded that the 1-year period in Article 12 of the Hague Convention is not subject to equitable tolling. We therefore affirm that court's judgment.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–820

_____

## MANUEL JOSE LOZANO, PETITIONER *v.* DIANA LUCIA MONTOYA ALVAREZ

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[March 5, 2014]

JUSTICE ALITO, with whom JUSTICE BREYER and JUSTICE SOTOMAYOR join, concurring.

I concur fully in the opinion of the Court. I write separately to explain why courts have equitable discretion under the Hague Convention to order a child's return even after the child has become settled, and how that discretion prevents abuses that petitioner claims will follow from holding that Article 12's 1-year period may not be equitably tolled.

The Convention is designed to protect the interests of children and their parents. Much of the Convention can be understood as an attempt to balance the various interests of children and non-abducting parents when a parent abducts a child from the child's country of habitual residence.

When a child has been absent from the country of habitual residence for less than a year, the Convention conclusively presumes that the child's nascent attachment to the new country is outweighed by the non-abducting parent's interest in prompt return and the child's own interest in returning to the country from which he or she was removed just a few months previously. This is why Article 12 requires return "forthwith" if the petition for return is brought within a year of abduction, unless one of the narrow exceptions set forth in Article 13 or 20 applies.

Hague Convention on the Civil Aspects of International Child Abduction (Hague Convention or Convention), Oct. 25, 1980, T. I. A. S. No. 11670, S. Treaty Doc. No. 99–11 (Treaty Doc.), p. 9. But, as the Convention recognizes, at some point the child will become accustomed to the new environment, making Article 12's conclusive presumption inappropriate. Thus, if the petition for return is brought after a year has elapsed, the court must determine whether the child has become "settled" in the new country; and if this has occurred, the court need not order return. *Ibid.* As the majority recognizes, this provision of the Convention "opens the door to consideration of . . . the child's interest in settlement." *Ante,* at 13.

But opening the door to consideration of the child's attachment to the new country does not mean closing the door to evaluating all other interests of the child and the non-abducting parent. The fact that, after one year, a child's need for stability requires a court to take into account the child's attachment to the new country does not mean that such attachment becomes the *only* factor worth considering when evaluating a petition for return.

Nothing in Article 12 prohibits courts from taking other factors into account. To the contrary, the Convention explicitly permits them to do so. Article 18 provides that "[t]he provisions of this Chapter [including Article 12] do not limit the power of a judicial or administrative authority to order the return of the child at any time." Hague Convention, Treaty Doc., at 11. A court thus has power to order the child's return in the exercise of its sound discretion even where Article 12's obligation to order such return no longer applies.

This provision makes eminent sense. Even after a year has elapsed and the child has become settled in the new environment, a variety of factors may outweigh the child's interest in remaining in the new country, such as the child's interest in returning to his or her original country

of residence (with which he or she may still have close ties, despite having become settled in the new country); the child's need for contact with the non-abducting parent, who was exercising custody when the abduction occurred; the non-abducting parent's interest in exercising the custody to which he or she is legally entitled; the need to discourage inequitable conduct (such as concealment) by abducting parents; and the need to deter international abductions generally.

Article 12 places no limit on Article 18's grant of discretionary power to order return. Article 18 expressly states as much. See *ibid.* (Article 12 "do[es] not limit the power of a judicial or administrative authority to order the return of the child"). Even without Article 18's express language, it would be clear that Article 12 merely tells a court when it *must* order return, without telling it when it *may* do so. Article 12 states that, after the 1-year period has elapsed, a court "shall . . . order the return of the child, unless it is demonstrated that the child is now settled in its new environment." *Id.*, at 9. The final clause indicates when the obligation imposed earlier in the sentence terminates; it does not substitute for that obligation a prohibition on ordering return. When a mother tells her child, "Come straight home from school, unless one of your friends invites you to a movie," the mother has not prohibited her child from coming home immediately after school even if a friend proposes a film. Cf. *Department of Commerce* v. *United States House of Representatives*, 525 U. S. 316, 339 (1999) (explaining that the meaning of a similar sentence structure in 13 U. S. C. §195 "depends primarily on the broader context in which that structure appears"). Thus, nothing in Article 12 calls into question the discretionary power of courts to order return after the 1-year period has expired and the child has become settled.

Reading the Convention to impose a prohibition on return would be highly anomalous, given that the "Con-

vention is based on the principle that the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence." *Abbott* v. *Abbott*, 560 U. S. 1, 20 (2010). Such a prohibition would run counter to other provisions of the Convention. For instance, Article 13(b) gives a court discretion to return or decline to return a child who has not become settled if "there is a grave risk that . . . return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, Treaty Doc., at 10. If a court has discretion to order return even where such return poses "a grave risk" of harm or threatens to place the child in an "intolerable situation," surely it has discretion to order return when faced with the lesser risk attendant on removing a child from the child's present environment (especially given that the child will generally be returning to a known environment: her country of habitual residence).

The State Department has adopted the view that the Convention empowers a court, in its equitable discretion, to return a child who has become settled. In the analysis that it provided to the Senate in connection with the ratification process, the Department made clear that, even when a year has elapsed and the child has become settled, a court may still consider such factors as "evidence . . . concerning the child's contacts with and ties to his or her State of habitual residence," "[t]he reason for the passage of time," and any concealment by the abducting parent in determining whether to order return. Hague International Child Abduction Convention; Text and Legal Analysis (State Legal Analysis), 51 Fed. Reg. 10494, 10509 (1986). The Department continues to endorse this view today. See Brief for United States as *Amicus Curiae* 19. As this Court has previously explained (in the context of the Convention, in fact), the State Department's interpretation of treaties "'is entitled to great weight.'" *Abbott*,

*supra*, at 15 (quoting *Sumitomo Shoji America, Inc.* v. *Avagliano*, 457 U. S. 176, 185 (1982)).

So, too, is the interpretation of the courts of our sister signatories. See *Abbott*, *supra*, at 16. The United Kingdom's House of Lords (at the time that nation's highest court) has held that "a settled child might nevertheless be returned" by a court in the exercise of its discretion—a conclusion driven in part by acknowledgment of the inequity of rewarding concealment. *In re M*, [2008] 1 A. C. 1288, 1304, ¶31 (Eng. 2007) (opinion of Baroness Hale of Richmond). Likewise, the Supreme Court of Ireland has concluded that courts have equitable discretion to order return of a child who has become settled. See *P.* v. *B.* (No. 2), [1999] 4 I. R. 185. I am unaware of any high courts of states signatory that have concluded to the contrary.

Given the foregoing, it is perhaps unsurprising that the Courts of Appeals to have considered the question have found that a court possesses equitable discretion to order return of a child despite the child's having become settled in the new country. See *Yaman* v. *Yaman*, 730 F. 3d 1, 21 (CA1 2013); *Blondin* v. *Dubois*, 238 F. 3d 153, 164 (CA2 2001). And other Courts of Appeals have found more generally that none of the Convention's exceptions prohibit return. See, *e.g., Asvesta* v. *Petroutsas*, 580 F. 3d 1000, 1004 (CA9 2009); *Miller* v. *Miller*, 240 F. 3d 392, 402 (CA4 2001).

Equitable discretion to order return of a settled child is particularly important in light of the fact that the Convention, as the Court correctly holds today, does not provide for equitable tolling of Article 12's 1-year period. Petitioner predicts dire consequences from the Court's holding. He argues that, as a result of our decision, the United States will become an abduction haven, with parents concealing their children here until Article 12's 1-year period has run and then claiming their children have become settled and hence ineligible for return. But such

inequitable conduct would weigh heavily in favor of re-turning a child even if she has become settled. See, *e.g.,* State Legal Analysis, 51 Fed. Reg. 10509 ("If the alleged wrongdoer concealed the child's whereabouts from the custodian necessitating a long search for the child and thereby delayed the commencement of a return proceeding by the applicant, it is highly questionable whether the respondent should be permitted to benefit from such con-duct absent strong countervailing considerations"); *In re M*, *supra,* at 1310, ¶31 (recognizing that a court may take concealment into account in considering whether to return a settled child). Given the courts' discretion to order return in response to concealment, I do not believe the Court's decision today risks incentivizing parents to flee with their children to this country and conceal them.

Equitable discretion is also a far better tool than equita-ble tolling with which to address the dangers of conceal-ment. Equitable tolling would require return *every* time the abducting parent conceals the child and thereby pre-vents the non-abducting parent from filing a return peti-tion within a year, regardless of how settled in the new country the child has become. Thus, on petitioner's view, a court would be bound to return a 14-year-old child who was brought to the United States shortly after birth and had been concealed here ever since. By contrast, when a court exercises its equitable discretion, it may consider other factors in addition to concealment. While conceal-ment is a significant factor and should weigh heavily in a court's analysis, in appropriate cases it can be overcome by circumstances such as the extended length of the child's residence in this country, any strong ties the child has formed here, and the child's attenuated connections to his or her former country.

In short, I believe the power of a court, in the exercise of its sound discretion, to return even a settled child pre-vents the inapplicability of equitable tolling to Article 12's

1-year limit from encouraging parents to flee to the United States and conceal their children here.  In light of this understanding, I have no difficulty joining the opinion of the Court.