# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-30993

United States Court of Appeals
Fifth Circuit

**FILED**

April 28, 2016

Lyle W. Cayce
Clerk

FRANKLIN PLEITES HERNANDEZ,

Plaintiff - Appellant

v.

REINA LETICIA GARCIA PENA,

Defendant - Appellee

Appeal from the United States District Court
for the Eastern District of Louisiana

Before CLEMENT and HAYNES, Circuit Judges, and GARCIA MARMOLEJO, District Judge.*

MARINA GARCIA MARMOLEJO, District Judge:

Six-year-old D.A.P.G. was abducted from his home in Honduras and brought illegally into the United States by his mother Defendant–Appellee Reina Leticia Garcia Peña. Plaintiff–Appellant Franklin Pleites Hernandez filed a petition under the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670 (the Convention), seeking the return of his only child. The Convention provides as a general rule that when a court receives a return petition within one year of a child's wrongful removal, the court "shall order the return of the child

---

* District Judge of the Southern District of Texas, sitting by designation.

forthwith." Art. 12. Hernandez, however, filed his return petition two months outside of the one-year period, allowing the district court to consider the Convention's defense that the child is well-settled in his new environment and therefore should not be returned. The district court denied Hernandez's petition, concluding that D.A.P.G. was well-settled in his current community even though Garcia Peña's removal of D.A.P.G. from Honduras was wrongful.

This case presents an issue of first impression in this Circuit: the interpretation and application of the Convention's "well-settled" defense. For the reasons that follow we conclude that the district court erred in its application of this defense. Accordingly, we VACATE the district court's order and RENDER judgment in Hernandez's favor.

I.

Franklin Pleites Hernandez and Reina Leticia Garcia Peña, both Honduran citizens, are the parents of D.A.P.G. D.A.P.G. was born in Honduras on September 17, 2009, and grew up in the town of San Antonio, Copán, where both of his grandmothers and 27–45 other extended family members also reside. In 2012, Hernandez and Garcia Peña married, but their relationship deteriorated in the following years and they eventually stopped living together. Hernandez and Garcia Peña never divorced or sought a formal custody agreement, and Hernandez continued to see D.A.P.G. regularly. Then, without Hernandez's knowledge, Garcia Peña left San Antonio, Copán, with D.A.P.G. on May 20, 2014, and hired individuals to smuggle herself and D.A.P.G. into the United States.[1]

Garcia Peña and D.A.P.G. entered the United States illegally through Texas and were arrested by immigration authorities. They were

---

[1] At the bench trial, Garcia Peña testified that she paid "coyotes" to help bring them into the United States. "Coyote" is a term commonly used to describe an individual who is paid to smuggle persons across the Mexican border into the United States. *E.g.*, *United States v. Hernandez-Bautista*, 293 F.3d 845, 850 (5th Cir. 2002).

No. 15-30993

subsequently placed in removal proceedings and released into the United States with instructions to report at a later date. Upon their release into the United States, Garcia Peña and D.A.P.G. resided in Nashville for five months and then moved in October 2014 to New Orleans, Louisiana, where they currently live.

In New Orleans, Garcia Peña and D.A.P.G. live with Garcia Peña's boyfriend, also a Honduran citizen, and D.A.P.G.'s four-month-old half-sister, who was born in May 2015. D.A.P.G. is in kindergarten,[2] and Garcia Peña works in the housekeeping department of a hotel. Garcia Peña and D.A.P.G. also attend church regularly. Aside from these connections, however, D.A.P.G. has no family in New Orleans, and both Garcia Peña and D.A.P.G. are involved in active removal proceedings before the New Orleans Immigration Court.

Meanwhile, as Garcia Peña and D.A.P.G. began new lives in New Orleans, Hernandez remained in Honduras searching for his son. In June 2014, Hernandez contacted Honduran authorities, who in turn contacted the United States Department of State to seek D.A.P.G.'s return pursuant to the Convention. The Department of State did not locate D.A.P.G. and Garcia Peña in New Orleans until May 2015. After locating D.A.P.G., Hernandez filed a petition under the Convention in the United States District Court for the Eastern District of Louisiana on August 4, 2015, asserting that Garcia Peña wrongfully removed D.A.P.G. from Honduras and seeking D.A.P.G.'s prompt return.

II.

---

[2] At the time of the bench trial, D.A.P.G. had attended kindergarten for three weeks.

No. 15-30993

The district court scheduled an expedited bench trial, but the trial was delayed over a month by various continuances, including a continuance granted based on Garcia Peña's inaccurate belief that divorce and custody proceedings were pending in Honduras. The day before the bench trial, the district court held an emergency discovery status conference and ordered Garcia Peña to produce all notices she had received from the immigration court. On the morning of the bench trial, September 18, 2015, Garcia Peña produced two notices to appear for removal hearings, addressed to Garcia Peña and D.A.P.G. respectively. Both notices advised that the hearings were scheduled for July 20, 2015, and that failure to attend could result in an order of removal.

Both parties were represented by counsel at the bench trial. Garcia Peña stipulated that D.A.P.G. was wrongfully removed under the Convention, but argued that D.A.P.G. was well-settled in New Orleans and that return to Honduras would pose a grave risk of harm to D.A.P.G. The district court heard testimony from Hernandez, Hernandez's mother, Garcia Peña, Garcia Peña's boyfriend, a Honduran official, and community members in New Orleans. The court also conducted an in camera interview with D.A.P.G. and received exhibits into evidence. The bulk of Garcia Peña's witnesses' testimony focused on characterizing D.A.P.G. as a happy, well-adjusted, and friendly six-year-old who during the past nine months in New Orleans had formed new relationships at church, at school, and at home with his four-month-old half-sister and his mother's boyfriend.

Among the exhibits introduced were the notices to appear for removal proceedings before the New Orleans Immigration Court, addressed to Garcia Peña and D.A.P.G. Garcia Peña testified that although she received the notices, she intentionally did not attend the immigration court hearings because she feared she would be deported. In closing arguments,

4

Hernandez's counsel represented to the district court that he believed D.A.P.G. and Garcia Peña had been ordered deported based on calls to the immigration court's status hotline that morning; however, no evidence of deportation orders was actually introduced.

On September 25, 2015, the district court issued its findings of fact and conclusions of law. The district court concluded that the testimony at trial established by a preponderance of the evidence that D.A.P.G. is well-settled in the United States. The court then denied Hernandez's return petition without addressing the grave risk of harm defense. With regard to the well-settled defense, the district court concluded that D.A.P.G.'s immigration status did not outweigh his "age, stability of new residence, school attendance, friendships in the new area, participation in the community and respondent's employment and financial stability." Specifically, the district court categorized Garcia Peña's and D.A.P.G.'s immigration status as generally "questionable," instead of focusing more concretely on their involvement in active removal proceedings.

Hernandez immediately filed a motion for a new trial pursuant to Federal Rule of Civil Procedure 59 to present new evidence that Garcia Peña and D.A.P.G. had been ordered deported from the United States. The district court denied the motion on the grounds that the new evidence would not change the outcome of the case.

On appeal Hernandez challenges the district court's determination that D.A.P.G. is well-settled in New Orleans and its denial of the Rule 59 motion. [3]

---

[3] We do not address the grave risk of harm defense because Garcia Peña has failed to brief this issue as a basis for affirmance. *Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 653 (5th Cir. 2004). We do "construe this rule more leniently when the party who fails to brief an issue is the appellee." *United States v. Luna*, 264 F.3d 1142, at *3 (5th Cir. 2001) (unpublished). But nevertheless, we find that Garcia Peña's inadequate briefing

No. 15-30993

III.

The Hague Convention on the Civil Aspects of International Child Abduction was adopted by its signatories, which include the United States and Honduras, to address "the problem of international child abductions during domestic disputes." *Abbott v. Abbott*, 560 U.S. 1, 8 (2010). The terms of the Convention were implemented by Congress through the International Child Abduction Remedies Act (ICARA), 22 U.S.C. §§ 9001–11.

The Convention's two express objectives are: (1) "to secure the prompt return of children wrongfully removed to or retained in any Contracting State" and (2) "to ensure that rights of custody and access under the law of one Contracting State are effectively respected." Art. 1. The return remedy is the central operating feature of the Convention and provides that a wrongfully removed child must be returned to his or her country of habitual residence unless certain defenses[4] apply. *Lozano v. Montoya Alvarez*, 134 S. Ct. 1224, 1228–29 (2014). Notably, the return remedy does not address the merits of any underlying custody dispute but instead only determines where any custody decision should be made. *Sanchez v. R.G.L.*, 761 F.3d 495, 503 (5th Cir. 2014); *see also* 22 U.S.C. § 9001(b)(4). As the Supreme Court has explained, the return remedy "is based on the principle that the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence." *Abbott*, 560 U.S. at 20. This principle works to "restore the pre-abduction status quo and deter parents from crossing borders in search of a more sympathetic court." *England v.*

---

constitutes waiver. Even if we considered this issue, we conclude that Garcia Peña failed to present sufficient evidence to support this defense.

[4] These defenses are commonly referred to interchangeably by courts as "exceptions," which is the term employed by the implementing legislation. *See* 22 U.S.C. § 9003(e)(2).

No. 15-30993

*England*, 234 F.3d 268, 271 (5th Cir. 2000) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1064 (6th Cir. 1996)).

But, while the Convention is designed to discourage child abduction, it "does not pursue that goal at any cost." *Lozano*, 134 S. Ct. at 1235. The Convention recognizes that the interests of a child may be better served by the child remaining in a new environment and provides "several *narrow* affirmative defenses to wrongful removal." *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 343 (5th Cir. 2004) (emphasis added); *see also* Elisa Pérez–Vera, *Explanatory Report: Hague Convention on Private International Law* ¶ 34, *available at* https://assets.hcch.net/upload/expl28.pdf (explaining that these defenses are to be interpreted narrowly to avoid undermining the objectives of the Convention).[5]    When addressing these defenses to return, courts "must strive always to avoid a common tendency to prefer their own society and culture." *Abbott*, 560 U.S. at 20.

This case concerns the Convention's well-settled defense.

IV.

A district court's determination of whether a child is well-settled presents a mixed question of law and fact. *See In re B. Del C.S.B.*, 559 F.3d 999, 1008 (9th Cir. 2009). We review the district court's factual findings for clear error, and its legal conclusions *de novo*. *England*, 234 F.3d at 270. "A factual finding is not clearly erroneous as long as it is plausible in the light of the record as a whole." *Sealed Appellant*, 394 F.3d at 342 (citation omitted).

V.

We conclude that the district court erred in its legal analysis and application of the Convention's well-settled defense.

---

[5] The Pérez–Vera Explanatory Report "is recognized as the official history, commentary, and source of background on the meaning . . . of the Convention." *Sealed Appellant*, 394 F.3d at 343.

7

No. 15-30993

Article 12 of the Convention provides, in relevant part, that when return proceedings are commenced more than one year after the date of wrongful removal, the court must "order the return of the child, unless it is demonstrated that the child is now settled in its new environment." Art. 12. The underlying purpose of this defense is to recognize that at some point a child may become so settled in a new environment that return is no longer in the child's best interests. *Lozano v. Alvarez*, 697 F.3d 41, 53 (2d Cir. 2012), *aff'd sub nom. Lozano v. Montoya Alvarez*, 134 S. Ct. 1224 (2014). The term "settled" is not defined in the Convention or its implementing legislation. *Id.* at 56. The State Department has explained that the term requires "nothing less than substantial evidence of the child's significant connections to the new country," and that claims should "be considered in light of evidence . . . concerning the child's contacts with and ties to his or her State of habitual residence." Hague International Child Abduction Convention; Text and Legal Analysis (State Legal Analysis), 51 Fed. Reg. 10,494, 10,509 (1986); *see also Abbott*, 560 U.S. at 15 (reiterating that the Executive Branch's interpretation of a treaty is entitled to great weight). A respondent has the burden to prove this defense by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(B).

This Court has never reached the merits of the well-settled defense, contained in Article 12 of the Convention. *Vasconcelos v. Batista*, 512 F. App'x 403, 404 n.3 (5th Cir. 2013) (per curiam). We join the circuits that have addressed this issue and hold that the following factors should be considered: (1) the child's age; (2) the stability and duration of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child has friends and relatives in the new area; (5) the child's participation in community or extracurricular activities; (6) the respondent's employment and financial stability; and (7) the

8

immigration status of the respondent and child. *See Lozano*, 697 F.3d at 57; *In re B. Del C.S.B.*, 559 F.3d at 1009. Courts diverge, however, with regard to the significance of immigration status, which forms the crux of the parties' arguments here.

In the instant case, Hernandez argues that a lack of legal immigration status must weigh heavily against finding a child well-settled. Alternatively, Garcia Peña contends that the well-settled analysis requires a multifactor, holistic inquiry where immigration status is never dispositive. Only the Second and Ninth Circuit have addressed this issue.

In *Lozano*, the Second Circuit concluded that "immigration status should only be one of many factors courts take into account . . . . [and] that, in any given case, the weight to be ascribed to a child's immigration status will necessarily vary." 697 F.3d at 56. The court emphasized that this approach is consistent with the underlying purpose of the defense and with the State Department's position that immigration status is not dispositive. *Id.* at 49, 56–57. The Second Circuit also explained that the proper inquiry is not abstract but fact-specific, and is broader than just the threat of deportation. For example, the importance of immigration status "will inevitably vary for innumerable reasons, including: the likelihood that the child will be able to acquire legal status or otherwise remain in the United States, the child's age, and the extent to which the child will be harmed by her inability to receive certain government benefits." *Id.* at 57.

The Ninth Circuit also declined to announce a categorical rule for the weight to be given to immigration status. *See In re B. Del C.S.B.*, 559 F.3d at 1010, 1009–10 ("In some circumstances, we will also consider the immigration status of the child and the respondent. In general, this consideration will be relevant only if there is an immediate, concrete threat of

9

deportation.").[6] Unlike the Second Circuit, however, the Ninth Circuit's focus was not fact-specific but generally emphasized the insignificance of immigration status when there is no concrete threat of removal, devoting extensive commentary to the low-risk of deportation for most undocumented aliens. *Id.* at 1012–14 ("[T]he reality is that millions of undocumented immigrants are presently living in the United States . . . without ever having any contact with immigration authorities.").

We join the Second and Ninth Circuits in concluding that immigration status is neither dispositive nor subject to categorical rules, but instead is one relevant factor in a multifactor test. This approach recognizes that immigration status alone does not necessarily prevent a child from developing significant connections in a new environment, and is consistent with the text of the treaty, the State Department's guidance, and the purpose of the well-settled defense. Like the other factors, however, immigration status should not be considered in the abstract. In other words, proper application of the framework does not assign automatic treatment to any particular type of immigration status. Instead, we agree with the Second Circuit that an individualized, fact-specific inquiry is necessary in every case.

Here, the district court did not clearly err in its factual findings but erred in its legal interpretation and application of the well-settled defense. Although the district court purported to adopt the Second Circuit's balancing test, it erred in its application. Specifically, the district court erred by treating immigration status as a factor in the abstract. That is, the district

---

[6] Arguably, some parts of the Ninth Circuit's opinion can be read to propose a categorical rule that weighs immigration status heavily only where there is a concrete threat of removal. *Id.* ("[O]nly in a case in which there is an immediate, concrete threat of removal can immigration status constitute a significant factor . . . ."). To the extent this is in tension with other parts of the opinion that advocate a more flexible approach, where immigration status is merely relevant when there is a concrete threat of removal, it appears the court did not announce a true categorical rule for immigration status.

court failed to adequately examine Garcia Peña's and D.A.P.G.'s actual immigration status. Instead, the district court discredited the impact of immigration status generally by relying on the Ninth Circuit's reasoning that "the likelihood of deportation of law-abiding aliens . . . is small, both because of the sheer number of undocumented immigrants and because the government has set a priority to deport those with criminal records." *In re B. Del C.S.B.*, 559 F.3d at 1012. This type of broad statement fails to take into account relevant, case-specific distinctions that may exist among and between different immigration statuses. Hence, the district court's method of analysis and conclusion that D.A.P.G. was well-settled, without a proper analysis of Garcia Peña's and D.A.P.G.'s specific immigration status, was incorrect.

On *de novo* review, D.A.P.G. and Garcia Peña's involvement in active removal proceedings must be considered when balancing the factors. Garcia Peña admitted she and D.A.P.G. received notice of, but did not attend, scheduled final removal hearings in July 2015. In fact, these hearings alone distinguish Garcia Peña and D.A.P.G. from the putative individuals described by the Ninth Circuit who will never have contact with immigration authorities. Moreover, D.A.P.G. and Garcia Peña are both within current DHS civil enforcement priorities as new immigration violators. *See* U.S. Dep't of Homeland Security, Policies for the Apprehension, Detention, and Removal of Undocumented Immigrants, Memorandum (Nov. 20, 2014) ("Aliens described in this priority . . . represent the second-highest priority for apprehension and removal. . . . (c) aliens . . . who cannot establish to the satisfaction of an immigration officer that they have been physically present in the United States continuously since January 1, 2014.").

Giving due consideration to immigration status and the other relevant factors listed above, the thin evidence in the record does not demonstrate that

D.A.P.G. has formed significant connections to his new environment. The first factor we consider is the child's age. Here, D.A.P.G. turned six years old the day before the bench trial. In other words, he is a very young child not able to form the same level of attachments and connections to a new environment as an older child. *See Lozano*, 697 F.3d at 48 (noting that the district court found the five-year-old child "too young to form certain types of connections"). The second factor is the stability and duration of the child's new residence. With regard to this factor, although D.A.P.G.'s residence is stable, he has lived in New Orleans less than a year. The third and fourth factors we look to are whether the child attends school consistently and has friends and relatives in the new environment. At the time of the bench trial, D.A.P.G. had regularly attended kindergarten for three weeks. D.A.P.G.'s acquaintances in the community are dependent on his mother. He has an infant half-sister who is one of two relatives in New Orleans. In comparison, he has a large extended family through both his mother and father in Honduras. The fifth factor we consider is participation in community activities. With respect to this factor, D.A.P.G. attends church regularly with his mother. As to the sixth factor, the respondent's economic and employment stability, Garcia Peña is employed in a hotel housekeeping department and is able to provide for D.A.P.G.'s needs. Finally, the seventh factor we consider is immigration status. D.A.P.G. and Garcia Peña are both illegally present in the United States and involved in active removal proceedings. This involvement in active removal proceedings and categorization as new immigration violators seriously threatens their ability to remain in the United States.

Balancing the above factors on *de novo* review, we are not persuaded that D.A.P.G. has formed significant connections to his new environment and thus conclude D.A.P.G. is not well-settled under the Convention. As a result,

No. 15-30993

we do not need to address Hernandez's claim that the district court erred in declining to grant his Rule 59(a) motion.

## VI.

Because we conclude that D.A.P.G. is not well-settled in his new environment, we VACATE the district court's order and RENDER judgment in Hernandez's favor. Thus, D.A.P.G. must be returned to Honduras without delay.[7] Moreover, we emphasize that this is not a custody decision but a conclusion that any custody determinations should be made by Honduran courts. We REMAND to the district court to finalize the details of D.A.P.G.'s return, including the financial considerations. *See* 22 U.S.C. § 9007(b)(3).

Additionally, we order that the mandate shall issue if no petition for panel rehearing or rehearing en banc is filed within seven days of the issuance of this opinion. *See* Fed. R. App. P. 35 & 40.

---

[7] Prompt resolution of international child abduction cases is essential to safeguarding the best interests of the child and upholding the core spirit of the Convention. *Chafin v. Chafin*, 133 S. Ct. 1017, 1027 (2013) ("[W]hether at the district or appellate court level, courts can and should take steps to decide these cases as expeditiously as possible, for the sake of the children who find themselves in such an unfortunate situation.").