[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-16387
_____

D.C. Docket No. 8:16-cv-02444-VMC-TGW


ROQUE JACINTO FERNANDEZ,

Petitioner-Appellant,

versus

CHRISTY NICOLE BAILEY,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(November 20, 2018)

Before MARTIN, JORDAN, and WALKER,* Circuit Judges.

WALKER, Circuit Judge:

---

* John M. Walker, Jr., United States Circuit Judge for the Second Circuit, sitting by designation.

The American mother of the twin boys at the center of this case abducted them twice from Panama before they were six years old. After the first abduction, when they were infants, a Missouri court ordered their return to their native Panama under the Hague Convention on the Civil Aspects of International Child Abduction (the Hague Convention or Convention). The second time, when the boys were five and while custody proceedings were underway in Panama, their mother abducted them and took them to Tampa, Florida. It took their Panamanian father, Roque Jacinto Fernandez, two and one-half years to find them. When he petitioned the district court for their return this time, the district court denied the petition, finding that in the little over two years that the children had been in Florida they had become so settled that an exception to the Hague Convention's general principle of return applied. The father appealed to this court, arguing in relevant part that the district court erred by declining to exercise its discretion to order return, even if the children were settled, because of the mother's repeated abduction of the boys. We agree with the father that the district court abused its discretion by not ordering the children returned to Panama in the face of the mother's second abduction. Accordingly, we VACATE the district court's denial of the petition for removal, and REMAND to the district court to grant the petition

and enter a judgment ordering the children returned to Panama so custody proceedings can continue.

## I.    BACKGROUND

On May 15, 2009, American Christy Bailey ("the mother") fled Panama with her two nine-month-old sons without telling the boys' father, Roque Jacinto Fernandez ("the father").[1] After he found the mother and boys living in Cape Girardeau, Missouri, the father petitioned in the District Court for the Eastern District of Missouri (Limbaugh, *J.*) seeking the return of the boys to Panama under the Hague Convention. *See Fernandez v. Bailey*, No. 1:10CV00084 SNLJ, 2010 WL 3522134 (E.D. Mo. Sept. 1, 2010), *modified*, No. 1:10CV00084 SNLJ, 2010 WL 5399220 (E.D. Mo. Dec. 23, 2010). In September 2010, the Missouri district court ordered their return upon finding that the father had a custody right under Panamanian law, the mother's removal of the children was "wrongful" and in violation of the Convention, and none of the exceptions to return applied. The mother followed the order and returned to Panama with the children so custody proceedings there could determine the matter. As a precaution, the father,

---

[1] These uncontested facts are taken from the district court's factual findings.

3

unbeknownst to the mother, had an exit restriction put in place to prevent the mother from leaving the country again without his permission.

While the boys continued to live with their mother in Panama, their father visited with them every other weekend and pursued custody in Panamanian court. Because of the parents' animosity, the Panamanian judge designated a police station as the pick-up and drop-off point. These visits went on routinely until January 2013, when the father, in contravention of the custody arrangement in place, kept the children for two months. At the mother's request, a police officer retrieved the boys from their school and took them to court where the judge ordered the children returned to the mother. The father has not seen or spoken with the children since then.

For the next eleven months, the children remained in Panama with their mother. During this time, the father says he showed up for the regularly scheduled visits, which the mother denies. The father retained a lawyer in Panama to locate the children. In the meantime, the mother secured a well-paying job in Tampa, and on February 2, 2014, less than three and one-half years after she was ordered to return to Panama, and, with custody proceedings in Panama pending, the mother again abducted the children to the United States without telling the father. The boys are dual Panamanian-American citizens with American passports, and they were allowed to lawfully enter the country.

4

In the United States, the mother and the boys first moved into an apartment in St. Petersburg, Florida, where the boys started school. About a year later, the three moved to nearby Tampa, where the schools were better. The mother paid bills and taxes in her own name, and the children were signed up for T-Ball teams and camps using their own names as well.

Meanwhile, in Panama, the father continued to search for his children. In September 2014, frustrated by the lack of progress, the father hired a new attorney who sought information about the children from Panamanian immigration authorities. In January 2015, those authorities informed the father that the children had left Panama nearly a year earlier. At that point, the father turned to the U.S. Department of State ("State") for assistance in locating his children. In response, State mailed letters to the mother at multiple addresses in Florida that were never returned. Eventually the father's private investigator located the boys in Tampa, and on August 24, 2016—two and one-half years following their abduction from Panama—the father filed his second petition for return of the children, this time in the District Court for the Middle District of Florida. As in the first suit, the father's petition sought the return of the children under the Hague Convention. In response, the mother argued that the children should not be returned because (1) there was a grave risk of harm to the children if they returned to Panama, (2) the children had a mature objection to returning, and (3) the children were settled in their new home.

5

On September 12, 2016, the district court (Hernandez Covington, *J.*) commenced a three-day evidentiary hearing, during which the mother took the stand, the father testified in English by video from Panama, and the district court interviewed the boys *in camera*. Following the hearing, the district court found that the father had established a prima facie case under the Hague Convention because the children were wrongfully taken from Panama.[2]

Nevertheless, the district court determined that the mother had established by a preponderance of the evidence the affirmative defense that the children were settled within the meaning of Article 12 of the Convention. Although the district court acknowledged that it retained discretion to order the children returned, it declined to do so, finding that the children's interest in settlement outweighed the Hague Convention's purpose to discourage wrongful removals. Accordingly, on September 21, 2016, the district court entered an order denying removal to Panama. The father timely appealed.

## II.    DISCUSSION

On appeal, the father argues that the district court erred when it denied his petition to return the children to Panama by (1) misapplying the settled exception

---

[2] The district court heard evidence that at the time of her departure with the children, the mother presented to the Panamanian immigration authorities a forged document indicating that the father had consented. Although the mother denied forging the letter, and the district court made no finding on the issue, the mother conceded that the father never consented to the boys leaving the country.

to return, and (2) declining to exercise its discretion to order return, even if the children were settled, because of the mother's repeated abduction of the boys. We agree with the father that the district court abused its discretion by not ordering the children returned to Panama in the face of the mother's second abduction. Therefore, we conclude that return is required, and we need not address the district court's conclusion that the boys are settled.

A. The Hague Convention

Both Panama and the United States are signatories to the Hague Convention on the Civil Aspects of International Child Abduction. *See Status Table: Convention of 25 October 1980 on the Civil Aspects of International Child Abduction*, HAGUE CONFERENCE ON PRIVATE INTERNATIONAL LAW, https://www.hcch.net/en/instruments/conventions/status-table/?cid=24 (last visited November 19, 2018). That treaty has two aims: (1) "to secure the prompt return of children wrongfully removed to or retained in any Contracting State" and (2) "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States." The Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, art. 1, T.I.A.S. No. 11,670, 19 I.L.M. 1501, 1501. The Convention furthers its goal of "discourag[ing] child abduction," *Lozano v. Montoya Alvarez*, 572 U.S. 1, 16 (2014), by requiring signatory states to make available a remedy whereby parents

7

of abducted children can bring proceedings to compel the return of their children who have been taken to foreign countries.[3] *See* Hague Convention arts. 7, 12. This return remedy is "[t]he Convention's central operating feature," *Abbott v. Abbott*, 560 U.S. 1, 9 (2010), and "the core of the Convention," State Dep't Legal Analysis, at 10,507. It "lays venue for the ultimate custody determination in the child's country of habitual residence rather than the country to which the child is abducted." *Lozano*, 572 U.S. at 5. And it honors "the principle that the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence." *Abbott*, 560 U.S. at 20.

In the United States, Congress made the return remedy available by passing the International Child Abduction Remedies Act (ICARA) of 1988, which granted federal district courts jurisdiction to review petitions for return filed by the parents of abducted children. *See* 22 U.S.C. §§ 9001(b)(1), 9003(a).

For a parent whose child has been abducted to a foreign country, taking advantage of this return remedy is no easy task. Because ICARA requires reviewing courts to have personal jurisdiction over the abducted child, a parent can only file a return petition in the district where the child is located. *See Pielage v.*

---

[3] Although the Convention speaks of "abduction" broadly, it is not intended in "a criminal sense," and generally concerns abductions committed by a child's parent. *See* State Dep't, Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10,494-01, 10,503 (1986) [hereinafter "State Dep't Legal Analysis"].

*McConnell*, 516 F.3d 1282, 1286 (11th Cir. 2008) (citing 42 U.S.C. § 11603(b)). Practically, for a foreign parent seeking the return of their child from the United States to that parent's country, this means that the foreign parent cannot petition until they locate their missing child, a task that frequently proves to be difficult and time consuming.

What's more, under the Convention, if too much time has passed between the abduction and the filing, the right of return becomes circumscribed. *See Lozano*, 572 U.S. at 5. The Convention treats petitions filed in the first year differently from those filed more than one year after a child is removed: if the petition is filed within one year of the abduction, the signatory country where the child is located "shall order the return of the child forthwith"; but when a parent petitions for return more than a year after a child has been removed, the signatory country "shall also order the return of the child, unless it is demonstrated that the child is *now settled* in its new environment." Hague Convention art. 12 (emphasis added). While in both situations return remains the principal objective, after a year has passed, the abducting parent may prevent return by showing upon a preponderance of the evidence that the abducted child is "now settled" in their new country. *See id.*; *see also* 22 U.S.C. § 9003(e)(2)(B). This exception accounts for the reality that "at some point a child may become so settled in a new environment that return is no longer in the child's best interests." *Hernandez v. Garcia Pena*,

820 F.3d 782, 787 (5th Cir. 2016); *see also Lozano*, 572 U.S. at 15 ("[T]he expiration of the 1–year period opens the door to consideration of a third party's interests, *i.e.*, the child's interest in settlement.").

Because the one-year period is not subject to equitable tolling, *see Lozano*, 572 U.S. at 10, the combination of the personal jurisdiction requirement and the one-year period after which the child may be found settled (such that return will not be ordered automatically) presents a substantial hurdle for the parent whose child has been abducted and from whom the whereabouts of the child have been concealed. And this is so even when the parent's search is diligent and unflagging, because "at least in some cases, [a parent's] failure to file a petition for return within one year renders the return remedy unavailable." *Id.* at 5.

B.  The Meaning of "Settled"

What exactly it means for a child to be "settled" in the United States is not immediately apparent because neither the Convention nor ICARA defines the term. *See* 22 U.S.C. § 9001; Hague Convention art. 12. The binding precedent offers little additional guidance because the Supreme Court has yet to address the settled exception on the merits, *see Lozano*, 572 U.S. 1 (concerning only the availability of equitable tolling), and we have reviewed a district court's application of the settled exception in only one instance, in *Lops v. Lops*, 140 F.3d 927 (11th Cir. 1998). In *Lops*, we did not explicitly define the term and instead remarked only

10

that the district court properly concluded that "[']settled' means more than having a comfortable material existence." *Id.* at 946.

When both a statute and the treaty it implements do not define a term, we look to the term's plain meaning and the purpose of the treaty. *See Yapp v. Reno*, 26 F.3d 1562, 1569 (11th Cir. 1994) (citing *United States v. Alvarez-Machain*, 504 U.S. 655, 663 (1992)); *see also* Restatement (Third) of Foreign Relations Law § 325 (Am. Law Inst. 1987) ("An international agreement is to be interpreted in good faith in accordance with the ordinary meaning to be given to its terms in their context and in the light of its object and purpose."). In common parlance, "settled" suggests stability, permanence, and a lack of movement. *See Settle*, MERRIAM-WEBSTER (defining "settle" as "to place so as to stay" and "to establish or secure permanently"), https://www.merriam-webster.com/dictionary/settle (last visited November 19, 2018); *Settle*, AMERICAN HERITAGE DICTIONARY, https://ahdictionary.com/word/search.html?q=settle (defining "settle" as "[t]o discontinue moving and come to rest in one place" and "[t]o establish in a residence") (last visited November 19, 2018).

As for the treaty's purpose, the treaty was designed above all else to discourage international child abduction. The official report of the Convention makes clear that the return of the child is "the basic principle of the convention." Elisa Pérez-Vera, Explanatory Report ¶ 27 (1982),

11

www.hcch.net/upload/expl28.pdf (last visited July 12, 2018).[4] Furthermore, the drafters expressed concern that parents would abduct children in order to have custody adjudicated in a friendlier forum. *See id.* ¶ 15.

In addition, we look to the text of implementing legislation for indications as to how Congress intended a given provision to be interpreted. *See Medellin v. Texas*, 552 U.S. 491, 506 (2008). ICARA explicitly defines the Convention's exceptions as "narrow." 22 U.S.C. § 9001(a)(4). Given this plain Congressional intent that the exceptions apply narrowly, courts must take very seriously their responsibility under the Convention to ensure that its narrow exceptions to return do not "swallow[] the rule and render[] the Convention a dead letter." *Gomez*, 812 F.3d at 1011 (internal quotation marks omitted).

We also accord significant deference to the State Department's reasonable interpretation of a treaty term. *See Abbott*, 560 U.S. at 15. State has interpreted "settled" to relate not just to the child's situation in her new residence, but to her situation in her country of habitual residence. *See* State Dep't Legal Analysis, at 10,509. This requires weighing evidence of "the child's significant connections to

---

[4] We have previously recognized that "Pérez–Vera was the official reporter of the Hague Conference and her report is recognized as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention." *Gomez v. Fuenmayor*, 812 F.3d 1005, 1012 (11th Cir. 2016) (internal quotation marks omitted).

the new country," which are "considered in light of evidence . . . concerning the child's contacts with and ties to his or her State of habitual residence." *Id.*[5]

In light of these considerations, we believe that a child is settled within the meaning of ICARA and the Convention when a preponderance of the evidence shows that the child has significant connections to their new home that indicate that the child has developed a stable, permanent, and nontransitory life in their new country to such a degree that return would be to the child's detriment.[6] *See Hernandez*, 820 F.3d at 787 (requiring "significant connections to the new country"); *Lozano v. Alvarez*, 697 F.3d 41, 56 (2d Cir. 2012), *aff'd sub nom. Lozano v. Montoya Alvarez*, 572 U.S. 1 (2014) (interpreting "settled" to require "significant emotional and physical connections demonstrating security, stability,

---

[5] The full paragraph of the analysis reads as follows:

> If the Convention is to succeed in deterring abductions, the alleged abductor must not be accorded preferential treatment by courts in his or her country of origin, which, in the absence of the Convention, might be prone to favor "home forum" litigants. To this end, nothing less than substantial evidence of the child's significant connections to the new country is intended to suffice to meet the respondent's burden of proof. Moreover, any claims made by the person resisting the child's return will be considered in light of evidence presented by the applicant concerning the child's contacts with and ties to his or her State of habitual residence. The reason for the passage of time, which may have made it possible for the child to form ties to the new country, is also relevant to the ultimate disposition of the return petition. If the alleged wrongdoer concealed the child's whereabouts from the custodian necessitating a long search for the child and thereby delayed the commencement of a return proceeding by the applicant, it is highly questionable whether the respondent should be permitted to benefit from such conduct absent strong countervailing considerations.

State Dep't Legal Analysis, at 10,509.

[6] As discussed previously, to consider an ICARA petition, a district court must be able to exercise personal jurisdiction over the child sought to be returned. *See Pielage*, 516 F.3d at 1286. This makes it so virtually all federal cases applying the settled exception concern whether the child has become settled in the United States.

and permanence"). Although all returns will necessarily involve some level of disruption to the child or children involved, we caution that disruption should not be considered *per se* detrimental. Rather, the "settled" inquiry requires courts to carefully consider the totality of the circumstances.

C. Discretionary Application of the "Now Settled" Exception

Consistent with the language in Article 12, most courts in the United States have held that, after the first year of abduction, a court is permitted but not mandated to order the child's return notwithstanding the settlement of the child. *See, e.g.*, *Alcala v. Hernandez*, 826 F.3d 161, 175 (4th Cir. 2016) ("[A]lthough Article 12 permits a court to order the return of a settled child, it does not require the court to so decline."); *Yaman v. Yaman*, 730 F.3d 1, 18 (1st Cir. 2013) ("Article 12 in its own terms confers upon a federal district court the authority to order the return of a 'now settled' child."); *Blondin v. Dubois*, 238 F.3d 153, 164 (2d Cir. 2001) ("Article 12 [ ] allows—but does not, of course, require—a judicial or administrative authority to refuse to order the repatriation of a [now settled] child").

According to some commentators, however, a settled child cannot be returned. *See* Elizabeth A. Rossi & Brett Stark, *Playing Solomon: Federalism, Equitable Discretion, and the Hague Convention on the Civil Aspects of International Child Abduction*, 19 ROGER WILLIAMS U. L. REV. 106, 149 (Winter

2014) ("Article 12's prohibition on returning a settled child is mandatory. Following a determination [that he is settled], a child should not bear the brunt of a punishment aimed at deterring his parent and other would-be abductors."). This view is based on a fear, perhaps not unfounded, that if courts use their broad equitable powers without limitation to order return notwithstanding the existence of an applicable exception (e.g., being settled in a new environment), equity will render those exceptions dead letters. And there is the concomitant possibility that, in doing equity, a court will inadvertently and improperly take child custody issues (like the best interests of the child) into account in a Convention proceeding.

Notwithstanding these valid concerns, we conclude based on Article 18 of the Convention that a court can order the return of a wrongfully removed child who is settled in his new environment. Article 18 states that "[t]he provisions of this Chapter [Chapter 3, which includes Article 12] do not limit the power of a judicial or administrative authority to order the return of a child at any time," and the circuit courts which have addressed the issue have all held that this language, either standing alone or when read in conjunction with another provision (Article 12, for instance), grants courts the discretion to order the return of a child despite the existence of an exception to return. *See Custodio v. Samillan*, 842 F.3d 1084, 1091 (8th Cir. 2016); *Alcala*, 826 F.3d at 175; *Garcia v. Pinelo*, 808 F.3d 1158, 1167 (7th Cir. 2015); *Yaman*, 730 F.3d at 18–19; *de Silva v. Pitts*, 481 F.3d 1279,

15

1285 (10th Cir. 2007); *In re B. Del C.S.B.*, 559 F.3d 999, 1015–16 & n.21 (9th Cir. 2009); *March v. Levine*, 249 F.3d 462, 474 (6th Cir. 2001); *Blondin*, 238 F.3d at 164; *Feder v. Evans-Feder*, 63 F.3d 217, 226 (3d Cir. 1995).[7]

We have come to the same conclusion in an unpublished opinion. *See Fuentes-Rangel v. Woodman*, 617 F. App'x 920, 922 (11th Cir. 2015) (citing Article 18 and holding that the district court did not abuse its discretion in ordering the child "returned to Mexico despite [the child] being 'now settled' in the United States" because "allowing [the child] to remain with [the abducting parent] would condone [that parent's] conscious decision to opt out of established legal processes in favor of international self-help"). *See also Lozano*, 572 U.S. at 19 (Alito, J. concurring) ("A court . . . has power to order the child's return in the exercise of its sound discretion even where Article 12's obligation to order such return no longer applies. . . . Article 12 places no limit on Article 18's grant of discretionary power to order return. Article 18 expressly states as much."); Federal Judicial Center, The 1980 Hague Convention on the Civil Aspects of International Child Abduction: A Guide for Judges 65 (2012) (indicating that a court retains discretion to order return even when an exception has been established).

---

[7] We note that courts in other signatory countries have also ruled that a court has discretion under the Convention to order return despite the existence of an exception. *See, e.g., In re M* [2008] 1 AC (HL) 1288, 1304 ¶ 31, 2007 WL 4190579 (Eng. 2007) (opinion of Baroness Hale of Richmond); *B, Petitioner* [2013] CSOH 187, 2013 WL 6980638 (Scot. Ct. of Session) (opinion of Lady Wise).

The two primary objectives of the Convention, according to Article 1, are "to secure the prompt return of children wrongfully removed or retained," and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting State." *Alcala*, 826 F.3d at 175. As long as Article 18 discretion is cabined by these goals, courts should be able to avoid getting involved in "the merits of any underlying child custody claims." 22 U.S.C. § 9001(b)(4).

### D. Standard of Review

Because we conclude that a court may exercise its discretion to order the return of a child notwithstanding finding that an exception to return is met, we review the determination by the district court to return or not to return a child for an abuse of discretion. The abuse of discretion standard is deferential, and "allow[s] a range of choice for the district court, as long as that choice does not constitute a clear error of judgment." *United States v. Kelly*, 888 F.2d 732, 745 (11th Cir. 1989). In practice this means that "there will be occasions in which we will affirm the district court even though we would have gone the other way had it been our call." *In re Rasbury*, 24 F.3d 159, 168 (11th Cir. 1994). Nevertheless, discretion is not boundless. In a different context, we have said that a district court can commit a clear error of judgment, and thereby abuse its discretion, if it "considers the proper factors but balances them unreasonably." *United States v.*

*Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc) (discussing sentencing in criminal cases). We believe this is what happened here.

      E.  Conclusion

The return remedy is "[t]he Convention's central operating feature." *Abbott*, 560 U.S. at 9. Based on "the principle that the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence," *id.* at 20, return must be the default in order to "lay[ ] venue for the ultimate custody determination in the child's country of habitual residence rather than the country to which the child is abducted." *Lozano*, 572 U.S. at 5. As described above, the Convention was designed in part to prevent an abducting parent from wrongfully removing a child to a friendlier forum for the adjudication of a custody dispute. *See also England v. England*, 234 F.3d 268, 271 (5th Cir. 2000) ("The Convention's primary aims are to restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court.") (internal quotations omitted).

We do not suggest that district courts should regularly return a child under the Convention despite a finding of settlement in a new environment. To the contrary, a district court ordering the return of a settled child should be an infrequent occurrence, so as not to swallow the text of Article 12's stated exception. But this case, for several reasons, is unique.

18

First, this is the second time in five years that the mother has wrongfully removed the boys from Panama and brought them to the United States. And it is the second time that the father, from abroad, has had to petition a federal district court under the Convention for the return of the boys to their habitual residence in Panama.

Without the father's knowledge or consent, the mother abducted the boys from Panama, their habitual residence, and moved to Missouri when they were just nine months old. *See Fernandez v. Bailey*, No. 1:10CV00084 SNLJ, 2010 WL 3522134, at *1 (E.D. Mo. Sept. 1, 2010). The father petitioned a district court in Missouri under the Convention for their return to Panama. The district court determined that the children's removal was wrongful under the laws of Panama and that the Convention required an order immediately returning them to that country. That order was issued on September 1, 2010. *See id.* at *2.

Only three-and-a-half years later, the mother again wrongfully removed the boys from Panama and brought them to the United States. Such a second wrongful abduction is exceedingly rare, and we have only found two other cases involving multiple abductions. *See Pliego v. Hayes*, No. CV 5:15-CV-00146, 2015 WL 4464173, at *10 (W.D. Ky. July 21, 2015), *aff'd*, 843 F.3d 226 (6th Cir. 2016) (ordering return of child twice abducted by mother); *Mendez-Lynch v. Pizzutello*,

19

No. CIV.A. 2:08-CV-0008, 2008 WL 416934, at *1 (N.D. Ga. Feb. 13, 2008) (ordering return of children where mother had abducted children two times).

Here, the district court questioned the mother extensively about her second departure from Panama and whether she thought she was in violation of the law when she left:

> I'm still unclear about your leaving in February 2014, and why you thought you were not subject to those restrictions [the 2010 Missouri district court order] . . .  [b]ecause you had already gone through a legal proceeding . . . I'm not certain I understand what was so different . . . [w]hy you thought you could just pick up and come to the United States and not suffer any consequences, legally.

D.E. 38 at 110–11. But despite the rarity of these circumstances and its incredulity at the mother's second wrongful removal, the district court ruled that the children's interest in settlement outweighed the aims of the Convention. We believe that the district court abused its discretion by not sufficiently weighing the audacity (and significance) of a second wrongful removal.

The mother admitted that when she wrongfully removed the boys from Panama in 2014, she left the country without the father's knowledge. She also left the country in defiance of an exit restriction, which the Panamanian court had put into place in the wake of the 2009 abduction specifically to prevent the mother from leaving Panama with the children a second time. Because of this court-ordered exit restriction, the father did not believe the mother could have left the country with the boys, which resulted in him looking for them within Panama,

20

rather than outside it, from March of 2013 until January of 2015. It was not until January of 2015 that Panamanian immigration officials told the father that the children had left with the mother almost a year earlier, in February of 2014. The district court did not properly weigh the mother's flouting of the 2010 Missouri district court's injunction which ordered the return of the boys to Panama, or the mother's disrespect for the Panamanian court's exit restriction forbidding her from taking the boys from Panama.

Second, the wrongful removal at issue here occurred while the Panamanian courts were deeply involved in multiple issues related to the children's custody. The mother testified that, at the time of the 2014 removal, the Panamanian courts were in the process of deciding somewhere in the neighborhood of ten custody or custody-related matters between herself and the father. After the boys were returned from Missouri in 2010, the father requested and was granted formal visitation with the boys every other weekend. Because of the contentious relationship between the parents, a Panamanian court designated a local children's police station as the drop-off and pickup location. That court also addressed a restraining order the mother filed against the father, and ordered the return of the children to the mother when the father violated the visitation arrangement in January of 2013 and kept them for two months. By wrongfully removing the boys, the mother prevented the Panamanian courts from resolving these outstanding

21

issues. Comity and respect between signatory nations strongly counsel that we entrust the Panamanian courts, as the judicial authorities in the boys' country of habitual residence, with deciding the ongoing custody disputes and determining the boys' best interests, as they were doing when the mother engaged in self-help in 2014.

Third, the result of the district court's order is that child custody proceedings will now be held in Florida. But the father is currently not allowed, and likely will never be permitted, to come to the United States due to a juvenile felony burglary conviction.[8]

This means that the father will not be able to personally appear before a Florida court to argue for custody. As the district court recognized, this state of affairs gives the mother a decided home-field advantage in the custody proceedings, and significantly impedes the father's ability to fight for his rights:

> The court is deeply disturbed by [the mother's] actions. This is the second time [the mother] has removed the children from Panama without [the father's] consent. Because [the father] had been unable to secure a visa to attend the 2010 Hague Convention hearing because of his prior conviction, [the mother] likely knew that [he] could not travel to the United States to search for the children or participate in person if future custody proceedings were initiated

---

[8] The father testified that he committed a burglary of a home in the United States when he was sixteen years old, for which he served a short prison sentence and was then deported to Panama. In 2010, the Missouri district court found that in the past 14 years, the father had been rehabilitated and had matured into a responsible citizen, and discounted the felony's relevance on the mother's "grave risk of harm" argument. *See Fernandez*, 2010 WL 3522134, at *2.

here. As [the father] correctly pointed out, preventing this type of forum-shopping by parents was a major motivation for the enactment of the Hague Convention.

D.E. 31 at 28. But despite this acknowledgment, the district court concluded that "the children's interest in settlement in this case outweighs the other interests that would be served by returning the children to Panama." *Id.*

Given the confluence of the unique facts in this case—a second wrongful removal within five years in violation of a court-ordered exit restriction, the ongoing involvement of Panamanian courts in child custody issues, and the father's inability to come to the United to see his boys or to litigate custody issues in person—the district court's decision to not order the return of the boys was contrary to the aims and objectives of the Convention and constituted an abuse of discretion.

While we order the return of the children to Panama, we leave it to the district court to manage their return in a way that is least disruptive to the children's lives and to their educational prospects.

For these reasons, we VACATE the district court's denial of the petition for removal, and REMAND to the district court to grant the petition and enter a judgment ordering the children returned to Panama.[9]

---

[9] On remand, the district court retains no discretion to deny return. When an appellate court concludes that an exception applies, the appellate court may nevertheless remand the case to the district court to determine, in its discretion, whether to order return anyway. *See In re B.*

**VACATED AND REMANDED.**

---

*Del C.S.B.*, 559 F.3d at 1015 & n. 21; *see also* Hague Convention art. 18 ("The provisions of this Chapter do not limit the power of a judicial or administrative authority to order the return of the child at any time."). The reverse is not true, however. Because of the Convention's preference for return, it does not give courts comparable discretion to deny return once it has been determined that no exception applies, as is the case here. *See* Hague Convention art. 18.