[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

Nos. 20-14557; 21-10378
Non-Argument Calendar

_____

D.C. Docket No. 1:20-cv-00104-LAG

RODRIGO ANDRES ALVAREZ ROMERO,

Plaintiff - Appellant,

versus

MARIA EUGENIA GAJARDO BAHAMONDE,

Defendant - Appellee.

_____

Appeals from the United States District Court
for the Middle District of Georgia

_____

(May 25, 2021)

Before WILSON, MARTIN, and BRASHER, Circuit Judges.

PER CURIAM:

Rodrigo Andres Alvarez Romero appeals the district court's denial of his petition for return of his minor children pursuant to the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001–9010, the implementing legislation of the Hague Convention on Civil Aspects of International Child Abduction ("Hague Convention"), Oct. 25, 1980, T.I.A.S. No. 11,670. This consolidated case also includes his separate appeal of the district court's order denying his request to obtain transcripts from an ex parte hearing. Alvarez Romero argues that the district court's factual findings are clearly erroneous and objects to the district court's determinations: that his children are well-settled in the United States; that returning them to Chile would present a grave risk to their well-being; and that his eldest child was mature enough to object to returning to Chile. After careful review, we affirm the district court's denial of his petition.

**I.**

A. Factual Background

Because Alvarez Romero disputes the district court's factual findings, we review the factual background in some detail. ABB and PDCB are Alvarez Romero and Maria Eugenia Gajardo Bahamonde's minor daughters. ABB was born in 2006 and PDCB was born in 2013. Alvarez Romero and Gajardo Bahamonde are citizens of Chile and have never been married. Their children were born in Chile and lived there until December 2017, when Alvarez Romero

2

took them to the United States. The parties stipulated that they had no formal custody or visitation schedule established by a court.

Gajardo Bahamonde, ABB, and Mauricio Loyola (Gajardo Bahamonde's son from a prior relationship) testified that Alvarez Romero frequently abused Gajardo Bahamonde emotionally and physically, including beating her so severely she had a miscarriage. Because ABB and PDCB witnessed the abuse, the Chilean Family Court ordered them to undergo mental health treatment. In the treatment program, both children were diagnosed with "mild psycho-affective damage" due to the abuse they saw their father inflict on their mother. This abuse included an incident when Alvarez Romero broke her nose and another when he knocked her unconscious while the children were lying beside her in bed. Loyola testified that Alvarez Romero was often verbally and physically abusive to Gajardo Bahamonde in front of the children. He said that Alvarez Romero would hit his mother, call her "a whore," and say she was worth less than him because "he was an engineer and she was nothing." Loyola witnessed one occasion when Alvarez Romero beat Gajardo Bahamonde so severely that he broke her ribs. Loyola recounted at least one incident where ABB witnessed Alvarez Romero severely beat their mother. And both daughters often heard their father verbally abuse their mother. Alvarez Romero would beat Loyola as well, including by hitting him with a belt.

3

ABB witnessed several other incidents, including one when Alvarez Romero almost ran into ABB while trying to hit her mother. ABB also described Alvarez Romero's disturbing behavior toward ABB and PDCB. For example, he forced ABB to stay up for hours past her bedtime as punishment for doing poorly on a school assignment; he locked PDCB in the car while shopping when she wouldn't stop crying that she wanted her mother; and he took the children with him to buy drugs (which he used in their presence) and drove with the children while under the influence.

Alvarez Romero denied all allegations of abuse. He pointed out that Gajardo Bahamonde filed a petition for a restraining order in Chile but then recanted it, which he said shows she has a history of making false allegations. But Gajardo Bahamonde testified that she recanted the petition because Alvarez Romero threatened her. And her testimony was corroborated by the recantation report which noted that a third party also reported concerns about Gajardo Bahamonde's safety and recommended that the Family Court be informed about the possible threat to the children's safety. In light of this evidence, the district court found Alvarez Romero's claims that he never abused the mother of his children and that she falsified the allegations of abuse not to be credible.

The couple separated sometime after PDCB was born. Alvarez Romero says he maintained contact with the children following the separation and saw them

4

every weekend, including during his eight-month stay in a drug rehabilitation center. In contrast, Gajardo Bahamonde and Loyola say the children did not have regular contact with their father. In fact, the children's therapy notes indicate that they attempted to contact him during his stay in rehabilitation but that he did not respond. And, as Alvarez Romero acknowledged, in 2016 and 2017, he was subject to at least three protective orders that prohibited him from seeing the children. When asked how he saw the children every weekend when those orders were in place, Alvarez Romero did not provide a clear answer. Loyola also testified that Alvarez Romero "[h]ardly ever" saw the girls during that time. In light of these inconsistencies, the district court did not find Alvarez Romero's testimony about his constant contact with his children to be credible.

Following the separation, Gajardo Bahamonde lived with the children in abject poverty. Gajardo Bahamonde and ABB testified that they had to sell baked goods and their clothes to afford food, even though Alvarez Romero had a job. The children's mental health reports corroborated that testimony. Alvarez Romero did, though, keep the children on his health insurance and paid for their school.

In December 2017, Alvarez Romero told Gajardo Bahamonde he wanted to take the children to visit his mother in the United States, during which time they would also have the opportunity to visit Disney World. Gajardo Bahamonde consented to the trip, based on her belief that the children would be under the care

of their grandmother. She signed a travel authorization form allowing the children to travel to the United States from December 2017 to March 2018.

Gajardo Bahamonde testified that in January 2018, Alvarez Romero told her he would not be returning the children to Chile and that if she ever wanted to see them again, she would have to come join them in the United States. Alvarez Romero denies ever saying this. But that month, he got a full-time job in the United States, bought a car, and enrolled ABB in school and PDCB in daycare. He says this was all just part of their visit to the United States.

After she learned that Alvarez Romero enrolled the daughters in school and daycare in the United States, Gajardo Bahamonde left her job in Chile and sold possessions in order to pay for a ticket to travel to Alvarez Romero's mother's home in Florida in February 2018 to be with the children. Two months later, Gajardo Bahamonde moved out and took PDCB with her because, she says, Alvarez Romero began sexually harassing her and verbally and physically abusing her in front of the children. ABB testified that she saw Alvarez Romero abuse Gajardo Bahamonde while she was living with them in Florida. Gajardo Bahamonde also described an incident when Alvarez Romero pushed her while she was at work, prompting a co-worker to call the police. Gajardo Bahamonde's testimony about that incident is supported by a police report. Gajardo Bahamonde filed for a domestic violence protection order in Florida after that incident.

6

Initially, ABB stayed with her grandmother and father.  But after her grandmother went back to Chile, ABB's living situation worsened.  ABB testified that she started missing a lot of school, there was almost no furniture in the home they stayed in, she was alone in the home for most of the day, and was left without food or a phone.  Her mother came and took ABB to live with her after ABB called upset that she was stuck alone in the house with no food while Alvarez Romero was at work.

The Florida court scheduled two hearings about Gajardo Bahamonde's petition for a protective order.  Alvarez Romero did not appear and instead returned to Chile.  After Alvarez Romero failed to appear at the first hearing and returned to Chile, Gajardo Bahamonde moved to Georgia.  The petition was dismissed for failure to appear.  Gajardo Bahamonde did not further pursue the protective order after Alvarez Romero left the United States because she knew he could not return.

When Alvarez Romero returned to Chile, he took the children's passports with him.  Initially, he remained in contact with ABB.  They spoke about planning a trip for the children to return to Chile.  Gajardo Bahamonde repeatedly asked Alvarez Romero to return the passports but he never did.

After October 2018, there was no further direct communication between Alvarez Romero and the children.  Alvarez Romero says this is because Gajardo

7

Bahamonde prevented the children from talking to him and blocked his family on social media. Gajardo Bahamonde denies this and says she blocked Alvarez Romero from her own social media pages but never prevented him from communicating with the children.

Alvarez Romero's mother testified that she and all her family were blocked from speaking with the children on WhatsApp, the messaging platform they used, and other platforms after Alvarez Romero returned to Chile. ABB and Gajardo Bahamonde testified, to the contrary, that ABB continued to communicate with her father's family in Chile. ABB says her mother never prevented her from speaking with any of her family members, including her father. ABB received a copy of her grandfather's obituary from Alvarez Romero's family after Alvarez Romero returned to Chile.

Gajardo Bahamonde and the children moved to Georgia in November 2018. Since then, the children have lived in one home and attended the appropriate schools. The children's teachers testified that both children are excelling at school and, prior to the Covid-19 pandemic, participated in a number of extracurricular activities. The children get along with each other and have close friends at school and in their neighborhood. They are also close with Loyola, their half-brother, who visits from Alabama every few weeks.

8

Gajardo Bahamonde and the children's visas are expired.  An immigration attorney, who presented expert testimony as to immigration law matters, advised that Gajardo Bahamonde is not under any threat of removal and that she has three options for regularizing her status.

B. Procedural Background

In June 2020, Alvarez Romero filed an ICARA petition, claiming that, as of November 2018, Gajardo Bahamonde wrongfully retained the couple's two minor children, ABB and PDCB, in the United States, at the time 14 and 7 years old, respectively.  In August 2020, the parties presented five issues for the district court to determine, three of which are relevant to this appeal: (1) whether the children will face a grave risk of harm if returned to Alvarez Romero in Chile; (2) whether the elder child, ABB, is mature enough to object to her return to Chile and whether she has sufficiently done so; and (3) whether the children are well-settled in the United States.  The district court held a two-day evidentiary hearing on these issues.

Because Gajardo Bahamonde sought to rely on the mature child exception as to ABB, the district court interviewed ABB in chambers.  The district court first spoke to ABB alone and provided a summary to the parties.  During that interview, ABB explained that she felt more safe, secure, and stable with her mother in the United States because, while here, she does not fear that Alvarez Romero, her

9

father, will attack her mother. Next, the district court asked ABB questions the parties submitted in advance. The parties could not directly cross-examine ABB, but they listened to the district court interview her over the phone and were permitted to submit follow-up questions. Neither party submitted any follow-up questions.

During that hearing, ABB objected to returning to Chile. At the time of the hearing, ABB was 14 years old. She was doing well at school and the record does not indicate that she had any kind of difficulties adjusting to life in the United States. She stated that she wanted to stay in the United States because her life in Chile was unstable. In Chile, she lived in poverty, frequently moved, and was constantly in fear that Alvarez Romero would find them and hurt her mother. Without prompting, ABB described a number of instances where she saw her father beat her mother, including some incidents her mother did not know ABB witnessed. For example, she described an incident when her father threw boiling water on her mother while she was cooking, at which point ABB called the police. ABB, her mother, her sister, and her half-brother then had to live in a hotel to stay safe from her father. She recalled watching her father purchase and consume drugs in her presence. She also recalled several interactions with the police in Chile when they responded to Alvarez Romero's violent outbursts. ABB also testified that she witnessed her father hit her half-brother, giving him a black eye.

10

**II.**

When considering an appeal from an order denying a petition for return of a child under the Hague Convention, we review de novo the district court's interpretation and application of the Hague Convention and review its factual findings for clear error.  Berenguela-Alvarado v. Castanos, 950 F.3d 1352, 1357–58 (11th Cir. 2020).

Alvarez Romero first argues that ABB should not have been allowed to testify on substantive issues, such as Alvarez Romero's treatment of Gajardo Bahamonde, other than her particular objections to returning to Chile.  Next, he argues that the district court erred in considering the well settled defense because, he says, Gajardo Bahamonde concealed the location of the children.  Finally, he says that the district court's factual findings in support of its conclusions that the mature child exception applied, that the children were well-settled in the United States, and that the children faced a grave risk of harm if returned to Chile were clearly erroneous.  Separately, Alvarez Romero says the district court abused its discretion when it denied his request for a transcript from an ex parte hearing regarding Gajardo Bahamonde's request to permit her counsel to withdraw from the case.  We address each argument in turn.

A. <u>The District Court Was Entitled to Consider ABB's Testimony on Issues
Besides the Mature Child Exception</u>

Alvarez Romero argues that ABB could only testify about her objections to
returning to Chile because "the Hague Convention does not authorize the Court to
interview a child or any other witness in chambers, without the opportunity for
cross-examination, on substantive issues in the case." Instead, he says a court may
only interview a child to determine whether the mature child exception applies.
Alvarez Romero is mistaken about both the record and the law in this regard.

First, Alvarez Romero's complaint that he did not have an opportunity to
cross-examine ABB is misplaced. Alvarez Romero insisted that ABB not appear
in court and instead be interviewed in chambers. And he submitted numerous
questions for the district court to ask ABB, which it did. Alvarez Romero listened
as the district court posed his questions as well as those submitted by Gajardo
Bahamonde. He was then afforded the opportunity to submit any follow up
questions to the district court to pose to ABB in chambers. He chose not to.
Alvarez Romero was also afforded the opportunity to submit evidence to rebut
ABB's testimony; he did so, and the district court admitted it into evidence.
Alvarez Romero offers no argument as to what precisely he was denied the
opportunity to ask or introduce through a process designed to protect his daughter
from being directly questioned by her parents about her relationships with her
parents.

12

Second, contrary to Alvarez Romero's contentions, courts regularly rely on the child's testimony in Hague Convention cases for issues besides the mature child exception, including when determining whether the child would face a grave risk of harm if returned. See Blondin v. Dubois, 238 F.3d 153, 166 (2d Cir. 2001) ("[I]f a child's testimony is germane to the question of whether a grave risk of harm exists upon repatriation, a court may take it into account."); see also Karkkainen v. Kovalchuk, 445 F.3d 280, 286–87 (3d Cir. 2006) (relying on child's testimony to help determine her habitual residence). There is no prohibition on looking to a child's testimony for issues besides the mature child exception, nor is there any need for an affirmative authorization from the Hague Convention to do so.

The only support Alvarez Romero points to for the legal proposition that children can testify only about their objections to returning to their country of habitual residence are three unpublished district court decisions. The text of ICARA and the Hague Convention contain no such limitation. See 22 U.S.C. §§ 9001–9010; Hague Convention, Oct. 25, 1980, T.I.A.S. No. 11,670. And none of the cases Alvarez Romero cited indicate that there is any need for affirmative authorization by the Convention to consider a child's testimony about other matters relevant to a Hague Convention case. Instead, the district courts in those cases did

13

not indicate whether the child's testimony was limited to the mature child exception.[1]

Here, the district court determined that ABB's testimony about witnessing many instances of Alvarez Romero beating and abusing her mother, as well as Alvarez Romero's disturbing behavior toward ABB and her sister, was relevant to whether the children faced a grave risk of harm if returned to Chile. The district court did not abuse its discretion in considering this relevant evidence.

B.    The District Court Did Not Err in Crediting ABB's Testimony

Alvarez Romero next argues that the district court made an erroneous factual finding when it credited ABB's testimony. This argument fails as well.

"In an action tried without a jury, findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Direct Niche, LLC v. Via Varejo S/A, 898 F.3d 1144, 1149 (11th Cir. 2018) (quotation marks omitted and alteration adopted). "We give even greater deference to factfindings of the district court that are based on determinations of

---

[1] See Tomynets v. Koulik, 2017 WL 9401110, at *8–9 (M.D. Fla. May 26, 2017) (unpublished) (noting that child testified as to her experiences at school, with extracurriculars, and with her mother); Dalsgaard v. Montoya, 2011 WL 5037223, at *7 (M.D. Fla. Oct. 24, 2011) (unpublished) (describing in camera interview of child in chambers about her desire to remain in the United States); Leites v. Mendiburu, 2008 WL 114954, at *6 (M.D. Fla. Jan. 9, 2008) (unpublished) (same).

the credibility of witnesses." Berenguela-Alvarado, 950 F.3d at 1357–58 (quotation marks omitted). We will not displace the district court's factual findings when its account of the evidence is plausible in light of the entire record, even if we would have weighed the evidence differently and even where there may be inconsistencies in the record. Seaman v. Peterson, 766 F.3d 1252, 1261 (11th Cir. 2014).

Alvarez Romero has not shown that the district court's determination that ABB was credible was clearly erroneous. Substantial evidence supports the district court's credibility finding. ABB's testimony about Alvarez Romero's abuse was consistent with that of Gajardo Bahamonde's as well as that of Loyola's testimony. ABB's testimony about her strained relationship with her father was also corroborated by records evidencing Alvarez Romero's extended stay in a drug rehabilitation facility and the therapy notes from ABB's court-mandated mental health treatment. And her testimony that she stayed in touch with Alvarez Romero's family after he returned to Chile is corroborated by Gajardo Bahamonde's testimony and the fact that ABB received a copy of her grandfather's obituary from Alvarez Romero's family following Alvarez Romero's return to Chile.

The purported inconsistencies Alvarez Romero points to are either not, in fact, inconsistencies, or are so minor that they cannot serve as the basis for

15

overturning the district court's findings of fact. First, Alvarez Romero claims that ABB's testimony that she was hungry and homeless in Chile after her parents separated is contrary to evidence he submitted that he kept the children on his health insurance and paid for their schooling. However, there is nothing inconsistent in saying that the children and their mother did not have money for housing or food even while the children attended school and had health insurance. Next, Alvarez Romero says that ABB could not have witnessed him physically abusing Gajardo Bahamonde in Florida as that incident occurred at work, where she could not have been present. But it is not clear from the record whether ABB was describing the incident that occurred at work or a different incident that also occurred in Florida. Indeed, ABB testified that because they were in public, Alvarez Romero only "yell[ed]" at Gajardo Bahamonde and did not strike her, suggesting that ABB was testifying to a different instance of abuse. The fact that ABB says she witnessed a separate incident of abuse is hardly an indication that her testimony is not credible.

Finally, Alvarez Romero points out that ABB's testimony that she did not recall communicating with her father after he returned to Chile is not consistent with audio recordings he produced of conversations they had over WhatsApp. But the fact that ABB may have forgotten a couple of conversations over WhatsApp is an inconsistency that does not dispel the notion that she and her father were not

16

communicating frequently after he left the United States. And this discrepancy, alone, is certainly not sufficient for Alvarez Romero to show that the district court clearly erred in crediting her testimony.

C. The District Court Did Not Err in Finding the Mature Child Exception Applied to ABB

Alvarez Romero contends that the district court improperly applied the mature child exception to ABB. The mature child exception is one of several affirmative defenses a parent can assert to prevent return of the child under the Hague Convention. Hague Convention Art. 13 ("The judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views."). The burden is on the retaining parent to establish by a preponderance of the evidence that this exception applies. 22 U.S.C. § 9003(e)(2)(B).

Courts have relied primarily on three considerations in determining when this exception applies: (1) whether the child is sufficiently mature; (2) whether the child has a particularized objection to being repatriated; and (3) whether the objection is the product of undue influence. See Colon v. Mejia Montufar, 470 F. Supp. 3d 1280, 1295 (S.D. Fla. 2020) (citing Tsai-Yi Yang v. Fu-Chiang Tsui, 499 F.3d 259, 279 (3d Cir. 2007)).

17

As to the first factor, courts have looked to the child's age, ability to express mixed feelings, and to plan past obstacles as indications of maturity.  Id. at 1296.  Alvarez Romero says the district court relied solely on ABB's age in finding that she was sufficiently mature, but that assertion is not supported by the record.  The district court considered ABB's age (she was fourteen years old at the time), the fact that she was able to express some positive feelings about life in Chile, her ability to provide detailed answers demonstrating an understanding of her situation, and the testimony of her teacher in finding that she was sufficiently mature.

In determining whether a child has particular objections to repatriation, courts consider whether the child is expressing merely a preference against return or is "affirmatively objecting to returning to one country—when living in that country would be unacceptable."  Rodriguez v. Yanez, 817 F.3d 466, 477 (5th Cir. 2016).  Alvarez Romero claims that ABB expressed a mere preference to stay in the United States, but he does not support this claim with references to the record.  An actual review of the record shows that ABB provided lengthy and detailed particularized objections to being repatriated to Chile based on her father's constant verbal and physical abuse of her mother.

Alvarez Romero also insists that ABB's testimony could only be the product of Gajardo Bahamonde's undue influence.  When considering whether a child's objection is the product of undue influence, courts place great weight on whether

18

the objection is based on the child's firsthand experiences. <u>Colon</u>, 470 F. Supp. 3d at 1298 (collecting cases). Unquestionably, ABB's objections were based on her firsthand experiences. She described witnessing numerous incidents of Alvarez Romero physically and verbally abusing her mother, going hungry and homeless when Alvarez Romero cut off her mother financially, observing Alvarez Romero take drugs, and being subject to his harsh discipline.

Alvarez Romero places great weight on the fact that ABB referred to him by his first name during her testimony. But there is no evidence in the record that Gajardo Bahamonde ever instructed ABB to refer to him that way. In contrast, the record is replete with evidence of his domestic abuse, drug use, and negligent parenting, all of which would reasonably lead a child to have a distant relationship with a parent. The district court did not err in applying the mature child exception to ABB.

D. <u>The Children Are Well-Settled in the United States</u>

i.   The District Court Properly Considered the Well-Settled Defense

When a Hague Convention petition is filed more than a year after a child is retained, the retaining parent can assert the well-settled defense. Hague Convention Art. 12 (noting that the child must still be returned if the petition is filed after one year "unless it is demonstrated that the child is now settled in its

new environment.")  The retaining parent must establish that the child is well-settled by a preponderance of the evidence.  22 U.S.C. § 9003(e)(2)(B).

It is undisputed that Alvarez Romero filed the instant petition more than one year after Gajardo Bahamonde and the children remained in the United States.  But Alvarez Romero complains that the district court should not have considered the well-settled defense because he says Gajardo Bahamonde concealed the children's location from him.  Alvarez Romero's argument fails on both the facts and the law.

As a factual matter, the district court determined that Gajardo Bahamonde did not conceal the children's whereabouts from Alvarez Romero.  She moved only once (from Florida to Georgia), and since moving to Georgia the children have attended the same school, lived in the same house, and maintained contact with Alvarez Romero's family.  Absent from the record is any indication that Alvarez Romero attempted to contact his children and determine their whereabouts.  There is no evidence that Gajardo Bahamonde ever lied about the children's whereabouts or refused to answer Alvarez Romero's inquiries.  While she does not appear to have affirmatively informed Alvarez Romero of their whereabouts, that is different from active concealment.  There is no clear error in

the district court's factual finding that Gajardo Bahamonde did not conceal the children from Alvarez Romero.[2]

And even if the record indicated that Gajardo Bahamonde had concealed the location of her children, that alone would not prevent her from asserting the well-settled defense. As the Supreme Court held in Lozano v. Montoya Alvarez, 572 U.S. 1, 134 S. Ct. 1224 (2014), concealment does not equitably toll the one-year deadline for a parent to file a petition and preclude the retaining parent from asserting the well-settled defense. Id. at 4, 134 S. Ct. at 1228. While the Supreme Court noted that, as a factual matter, "steps taken to promote concealment can also prevent the stable attachments" that lead to a child being well-settled in a new country, that does not prohibit the retaining parent from asserting the defense. Id. at 17, 134 S. Ct. at 1236. Therefore, the district court properly considered the well-settled defense here.

ii. The Well-Settled Defense Applies to ABB and PDCB

Alvarez Romero argues that the district court's factual findings do not support its ruling that the children are well-settled in the United States.[3] In this

_____

[2] Further, the record reflects that Alvarez Romero was delayed in filing his petition not because of any alleged concealment, but because of a protracted dispute he had with the Chilean Central Authority in starting the petition process.

[3] Alvarez Romero also says he is challenging the district court's findings of fact, but he does not appear to dispute the facts. He only states that the facts were insufficient to support a finding that the children were well-settled. We construe this assertion as a challenge to the district court's applications of the law to the facts, not its findings of fact.

circuit, a child is well settled for purposes of the Hague Convention "when a preponderance of the evidence shows that the child has significant connections to their new home that indicate that the child has developed a stable, permanent, and nontransitory life in their new country to such a degree that return would be to the child's detriment." Fernandez v. Bailey, 909 F.3d 353, 361 (11th Cir. 2018). We review the district court's application of the well-settled defense for abuse of discretion. Id. at 363. Courts look to how frequently children move around within their new country, whether they attend extracurricular and community activities, and whether they regularly attend school when determining whether they are well-settled. Lozano, 572 U.S. at 17, 134 S. Ct. at 1236 (collecting cases).

The children have been living in the United States since December 2017, when Alvarez Romero brought them here. They have been enrolled in school in the United States since January 2018, when he first enrolled them. They have changed school districts only once—when they moved to Georgia in November 2018. Both children are doing well in school, as evidenced by their teachers' testimony and various awards they have received. Before the onset of the Covid-19 pandemic, both children were involved in numerous extracurricular activities, including music lessons, skating, swimming, and soccer. They have close friendships at school and in their neighborhood. They also spend time with their half-brother, who visits regularly from Alabama.

22

The district court noted that Gajardo Bahamonde is not a homeowner, does not appear to have an independent source of income, and is currently unmarried. But those factors alone are not dispositive in determining the stability of the children's lives in the United States. In addition, Gajardo Bahamonde is engaged to be married, and she and the children live with her fiancé.

We also note that Gajardo Bahamonde appears to have more support in the United States than she did in Chile. Whereas Alvarez Romero left her and the children to fend for themselves without housing or money for food, in the United States the children have stable housing and can spend their time on schoolwork and extracurricular activities rather than selling clothes and baked goods to get by.

Alvarez Romero places great weight on the fact that Gajardo Bahamonde and the children are currently not in lawful immigration status, a situation he created by leaving the children in the United States without their passports. But expert testimony indicated that Gajardo Bahamonde and the children are not under immediate threat of removal. Notably, the threat of removal is even more remote now, after Immigration and Customs Enforcement ("ICE") revised its enforcement priorities. See Memorandum from Tae D. Johnson, Acting Director ICE, Interim Guidance: Civil Immigration Enforcement and Removal Priorities (2021), https://www.ice.gov/doclib/news/releases/2021/021821_civil-immigration-enforcement_interim-guidance.pdf.

E.  The Children Would Face a Grave Risk of Harm if Returned to Chile

The Hague Convention states that a child does not have to be returned if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."  Hague Convention Art. 13(b).  The retaining parent must show that the child faces a grave risk of harm by clear and convincing evidence.  22 U.S.C. § 9003(e)(2)(A).  "[S]ufficiently serious threats and violence directed against a parent can . . . pose a grave risk of harm to a child."  Gomez v. Fuenmayor, 812 F.3d 1005, 1010 (11th Cir. 2016).

The record clearly establishes that ABB and PDCB would face a grave risk of harm if returned to Chile.  For years, Alvarez Romero physically and verbally abused Gajardo Bahamonde, including beating her so severely that she miscarried and breaking her ribs and nose.  The children witnessed numerous incidents of abuse, to the extent that they underwent court-mandated mental health treatment.  And when Gajardo Bahamonde was finally able to leave this abusive relationship, Alvarez Romero left her and their children homeless and hungry.  Alvarez Romero abused drugs while caring for his children, including in their presence.

Alvarez Romero challenges the district court's factual findings.  He argues that the district court should have credited his and his mother's testimony denying abuse instead of crediting Gajardo Bahamonde, ABB, and Loyola's testimony

24

describing his abuse and other disturbing behavior.  But Alvarez Romero again fails to show that the district court's credibility determinations were clearly erroneous.  Alvarez Romero says that the district court did not give enough weight to the fact that Gajardo Bahamonde's domestic violence petition against him in the United States was denied.  That argument is patently misleading as the petition was dismissed (not denied) after Alvarez Romero fled to Chile rather than appear before the Florida court.  He also says that her allegations that he sexually abused her in the United States are not credible because they went to Disney World together.  That argument is a non sequitur.[4]

Alvarez Romero also insists that because Gajardo Bahamonde recanted a petition for a restraining order in Chile, this shows her allegations of abuse are all false.  But Gajardo Bahamonde testified that she only recanted the petition after Alvarez Romero threatened her.  And even in the report reflecting the recantation, there is an indication that a third party expressed concerns for Gajardo Bahamonde and the children's safety and advised that the Family Court be informed of their situation.  We see no basis for displacing the district court's findings that the testimony that Alvarez Romero abused Gajardo Bahamonde for years was credible and his denials were not credible.

---

[4] Alvarez Romero also repeats his contention that the children could not have been hungry and homeless in Chile because he paid for their school and health insurance.  Again, school and health insurance do not provide shelter and food.  There is no inconsistency there.

25

We also note that the record reflects other inconsistencies in Alvarez Romero's statements that support an adverse credibility finding against him.  For example, he gave conflicting testimony as to whether he owned the company that he claims to have taken a leave of absence from when he took the children to the United States.  He also said that as of December 2019, he did not know where his children were.  But his own expert witness stated that Alvarez Romero knew their address in Georgia as early as November 2019.

F.  <u>The District Court Did Not Abuse Its Discretion When It Denied Alvarez Romero's Request to Obtain Transcripts from the Ex Parte Hearing About Gajardo Bahamonde's Attorney's Motion to Withdraw</u>

Finally, we address Alvarez Romero's challenge to the district court's denial of his request to obtain transcripts from the ex parte hearing where the district court considered Gajardo Bahamonde's motion to permit her counsel to withdraw.

Alvarez Romero takes issue with a parenthetical observation the district court included in a pretrial memorandum, noting that Gajardo Bahamonde's fiancé appeared to be supportive.  The district court made this observation during the ex parte hearing.  But the district court also clarified that "will only be a factor if he does, in fact, testify."  The district court did make a factual finding that Gajardo Bahamonde's relationship with her fiancé is stable and that the children "feel safe and settled" with him, but that was based on evidence in the record, including ABB's testimony.

The ex parte hearing did not address any substantive issues regarding Alvarez Romero's petition.  And even if Alvarez Romero were correct that it is relevant to the well-settled defense (he is not), we affirm the district court's denial of his petition on the separate ground that both children would be subject to a grave risk of harm if returned to Chile.  Therefore, the transcripts would not help Alvarez Romero even if they were relevant.

**AFFIRMED.**